SWANN, Judge, dissenting:
¶ 32 I respectfully dissent. The officers in this ease subjected Maeiel to custodial interrogation and did not issue Miranda warnings until after he had made incriminating statements. The statements should have been *208 suppressed, and the conviction should be reversed and remanded.
FACTUAL BACKGROUND
¶ 33 At the suppression hearing, Officer Huntley testified that once he arrived at the scene, he noticed Maciel sitting on the ground outside the church with a shopping cart containing personal items. Huntley contacted Maciel and asked him what he was doing. Maciel replied that he was just sitting next to the building. Huntley then asked Maciel about the window and Maciel stated that it was already damaged when he arrived at the church. Maciel was homeless, and as a part of his initial investigation, Huntley asked him questions about the shopping cart containing his personal possessions. To this point, I agree that there had been no custodial interrogation — the Supreme Court has “explicitly excluded general on-the-scene questioning for the purpose of investigating crime from its definition of ‘custodial interrogation.’ ” Morse, 127 Ariz. at 28, 617 P.2d at 1144.
¶ 34 Huntley then asked for Maciel’s identification and ran a warrants cheek, which came back clear, and then, with Maciel’s consent, conducted a pat-down search, which produced no weapons or other evidence of contraband. Huntley stated that he then had Maciel sit in the backseat of his patrol vehicle “[bjeeause [he] didn’t know if [Maciel] was involved at that point in a crime and [he] didn’t know if there was anyone inside the building.”
¶ 35 Whether one believes Huntley’s testimony or not, the act of placing an individual (especially one whose identification and warrant status raised no suspicions) in the back of a police car is inherently inconsistent with the reasonable freedom of movement that citizens normally have a right to expect.[5] I think it fair to say that most people who walk by, sit or stand near a building missing a board over its window do not reasonably expect to be confined in a police vehicle merely because the police “do not know” if they have been involved in a crime. And I daresay that many citizens routinely find themselves in the proximity of buildings with missing windows, yet they would reasonably believe themselves to be in custody if this simple fact landed them in the back of a police car.
¶36 When Ofc. Franklin arrived on the scene, Huntley “asked Mr. Maciel to exit the patrol vehicle and sit down on the curb next to the building” with Franklin watching over him. Ofc. Sanchez then arrived and she and Huntley conducted an initial search of the building while Franklin stood guard over Maciel. Though no longer within the confines of a police cruiser, Maciel was forced to wait for approximately an hour, under guard, while the police conducted an investigation that did not reasonably concern him. This too was inconsistent with an individual’s reasonable freedom of movement.
¶ 37 In these circumstances, I cannot agree with the majority that Maciel was not “deprived of his freedom of action in any significant way.” Kennedy, 116 Ariz. at 569, 570 P.2d at 511. When law enforcement officers place an individual in a police vehicle, then ask him to remain in a specific location while they stand guard, any remaining “freedom of action” is a pure legal fiction. Though there had not been a formal arrest at this point, neither was Maciel free to leave. He was, by any reasonable measure, in custody while the officers sought grounds to arrest him.
¶ 38 The pastor of the church then arrived and told Huntley that the window had been boarded up a few days earlier. Huntley asked the pastor if he would be willing to pursue a complaint against Maciel if Huntley found out that Maciel was the individual who had removed the board from the window. Huntley stated that he asked this question because if the pastor was not willing to be the victim of a crime, there was “really not *209 any reason to detain or to do any further investigation.”
¶ 39 Huntley then questioned Maciel again about the window and Maciel replied that “he pulled [the board] off because he went in to find some money.” Huntley placed Maciel under arrest, handcuffed him, and placed him in the back of his patrol car for the second time. Huntley cleared the building and looked for shoe impressions. When Huntley went back to his vehicle to speak with Maciel, he advised Maciel of his Miranda rights and continued to question him. Maciel admitted for the second time that he had pulled the board off the window and entered the building.
ANALYSIS
¶40 The court denied Maciel’s motion to suppress, citing three factors. The first factor was the site of the interrogation, which the court did not find was indicative of custody because the questioning took place at the church, and although Maciel was placed in a police ear for a time, he was later “allowed to sit on the curb.” The second factor was whether other objective indicia of arrest were present. The court found that Maciel was not handcuffed and was not told he was under arrest, and that therefore objective indicia of arrest were not present. And third, the court found the length and form of interrogation to be brief — despite the fact that Maciel was detained for at least an hour. The court also stated that because Huntley testified that he did not believe Maciel was in custody when he re-questioned him, “the questioning that took place in the second part of the interrogation ... was not a custodial interrogation.”
¶ 41 “Whether a defendant is in custody such that Miranda warnings are required to be given is determined by an objective test of whether a reasonable person would feel deprived of his freedom in a significant way.” State v. Perea, 142 Ariz. 352, 354, 690 P.2d 71, 73 (1984). “[T]he initial step is to ascertain whether, in light of ‘the objective circumstances of the interrogation,’ a ‘reasonable person [would] have felt he or she was not at liberty to terminate the interrogation and leave.’ ” Howes v. Fields, — U.S.-, 132 S.Ct. 1181, 1189, 182 L.Ed.2d 17 (2012) (citations omitted). To determine how a suspect would have gauged his freedom to leave, “courts must examine ‘all of the circumstances surrounding the interrogation.’ Relevant factors include the location of the questioning, its duration, statements made during the interview, the presence or absence of physical restraints during the questioning, and the release of the interviewee at the end of the questioning.” Id. (citations omitted) (emphasis added). In its analysis of Maciel’s motion to suppress, the trial court and the majority examine three of these “relevant factors,” but they give inadequate weight to the totality of the circumstances.
¶ 42 “[A]s the Arizona Supreme Court has recognized ... when the on-the-scene questioning becomes accusatory in nature and when a reasonable man would feel he was deprived of his freedom of action in a significant way ... Miranda warnings must be given.” State v. Starr, 119 Ariz. 472, 475, 581 P.2d 706, 709 (App.1978). And “[i]n assessing whether a detention is too long in duration to be justified as an investigative stop, we consider it appropriate to examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant.” United States v. Sharpe, 470 U.S. 675, 686, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985) (emphasis added).
¶ 43 Here, Huntley initially detained Maeiel and questioned him regarding his identity, searched him for weapons, and asked him if he was involved in removing the board from the window. This initial investigation produced no evidence that Maciel was involved in a crime and there was no basis upon which to further detain him. At this point, Huntley’s detention of Maciel should have ended.
¶ 44 But the majority reasons:
Once the officer observed evidence of a potential illegal entry, the building and the surrounding area became the scene of a criminal investigation over which he was in control. Rather than direct Maciel to leave the crime scene or allow him to *210 continue to sit by the open window when an intruder might still be inside, the officer asked Maciel to sit in the patrol vehicle where the officer believed he would be safer.
I respectfully disagree with this analysis. If every building that might have experienced a broken window days earlier constituted a crime scene of which the police are “in control,” then large areas of many communities in this state would perpetually be crime scenes under police control, and any passersby would automatically be subject to uncontrolled restraints on their freedom. The majority cites no authority for this sweeping proposition, and I cannot endorse it. The majority also apparently accepts Huntley’s suggestion that he placed Maciel in the police cruiser for his safety. With due deference to the trial court’s fact-finding role, there was simply no articulable danger to Maciel in these circumstances. The fact that an empty building may have had its window covering removed in the preceding 72 hours presented no clear and present threat to Maciel’s safety. And while such acute vigilance in protecting citizens’ safety from even inarticulable threats might be laudable in the abstract, that protective motive was tempered by the fact that Huntley was also encouraging a third party to pursue a speculative criminal complaint against the individual who was the focus of his care. Notably, the only other civilian at the scene, the pastor, was not asked to sit on the curb for “safety purposes” while another officer watched over him — he was free to leave and did so.
¶45 In truth, police were not “diligently pursuing a means of investigation likely to confirm or dispel their suspicions quickly.” This detention had far exceeded the time and scope of a general on-the-scene investigation and moved into a custodial interrogation when Huntley initiated his second round of questioning. See Zamora, 220 Ariz. 63, 68, ¶ 10, 202 P.3d 528, 533 (App.2009) (defining custodial interrogation as “questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way” (citation omitted)).
¶ 46 A suspect’s right not to incriminate himself does not come into existence only after he has expressed a desire not to have that right violated. “[UJnless other fully effective means are devised to inform accused persons of their right of silence and to assure a continuous opportunity to exercise it, the following measures are required. Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed.” Miranda, 384 U.S. at 444, 86 S.Ct. 1602 (emphasis added). Nowhere in Miranda did the court hold that a suspect must object to his detention before these warnings must be given or that a suspect must express a desire to leave before he is considered to be in custody. Though a suspect’s reaction to restraints on his liberty is a factor that may be relevant in a totality-of-the-eircumstanees analysis, it was hardly the most important factor in these circumstances. Miranda imposes on the police an obligation to provide warnings proactively— the rule simply does not work if the suspect has any obligation to demand those warnings.
¶ 47 The totality of the circumstances make clear that a reasonable person would not have felt free to terminate the encounter with Huntley. Maciel, a homeless man, was detained by multiple officers with all of his possessions for at least an hour while multiple police officers arrived on the scene and asked him the same questions multiple times. For part of this time, he was placed in the back of a police car — an environment from which no reasonable person would feel free simply to get out and leave. Then, a police officer was assigned to watch him while he sat on a curb, further enforcing the reasonable perception that he was not free to leave. During the second interrogation, Maciel was concededly in custody but was not given Miranda warnings until he had already made inculpatory statements. His statements should have been suppressed.
¶ 48 In Seibert, the court held that “the midstream recitation of [Miranda] warnings after interrogation and unwarned confession could not effectively comply with Miranda’s constitutional requirement,” and therefore, “a statement repeated after a warning in *211 such circumstances is inadmissible.” 542 U.S. at 604, 124 S.Ct. 2601. The court held that “unless the warnings could place a suspect who has just been interrogated in a position to make [ ] an informed choice [to stop talking], there is no practical justification for accepting the formal warnings as compliance with Miranda, or for treating the second stage of interrogation as distinct from the first, unwarned and inadmissible segment.” Id. at 612. The court further reasoned that, “[u]pon hearing warnings only in the aftermath of interrogation and just after making a confession, a suspect would hardly think he had a genuine right to remain silent, let alone persist in so believing once the police began to lead him over the same ground again. A more likely reaction on a suspect’s part would be perplexity about the reason for discussing rights at that point, bewilderment being an unpromising frame of mind for knowledgeable decision.” Id. at 613,124 S.Ct. 2601 (footnote omitted).
¶ 49 Under Seibert, the third interrogation (post-Miranda) could not sanitize the inculpatory statements that Maciel had already made, and all of the inculpatory statements should therefore have been suppressed.
¶ 50 For these reasons, I respectfully dissent.

. I find Cruz-Mata distinguishable in this regard. In that case, the defendant affirmatively accepted an invitation to travel to a police station with an officer in the front seat of a police car. 13 8 Ariz. at 373, 674 P.2d at 1371. Here, Maciel was placed in the back of a police car. The only "agreement” to enter the back of the car in this record was Maciel's failure to object. The purpose of Maciel’s presence in the police car was not mere transportation as in Cruz-Mata — it was confinement.