# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

JOHN EDWARD BARRITT,

Defendant-Appellant.

FOR PUBLICATION
August 9, 2018

No. 341984
Genesee Circuit Court
LC No. 15-038244-FC

Before: BORRELLO, P.J., and M. J. KELLY and BOONSTRA, JJ.

BOONSTRA, J. (*dissenting*).

I respectfully dissent. I conclude from my review of the record that, considering the totality of the circumstances, *People v Coomer*, 245 Mich App 206, 219; 627 NW2d 612 (2001), defendant was not in "custody" at the time of his interrogation. Therefore, I am left with a definite and firm conviction that a mistake has been made, *id.*, and would reverse the trial court's order granting defendant's motion to suppress.

As the majority notes, our Supreme Court vacated this Court's prior holding that defendant was in custody, and remanded the matter to the trial court

> to determine, in light of all of the objective circumstances surrounding the interrogation: (1) whether a reasonable person would have felt that he was not at liberty to terminate the interrogation and leave; and (2) whether the environment presented the same inherently coercive pressures as the type of station house questioning involved in *Miranda v Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). See *Howes v Fields*, 565 U.S. 499, 509; 132 S.Ct. 1181; 182 L.Ed.2d 17 (2012); *Yarborough v Alvarado*, 541 U.S. 652, 663; 124 S.Ct. 2140; 158 L.Ed.2d 938 (2004); *People v Elliott*, 494 Mich. 292, 308; 833 N.W.2d 284 (2013). [*People v Barritt*, 501 Mich 872; 901 NW2d 859 (2017).]

On remand, the trial court again found defendant to have been in custody, and the majority affirms. I agree with much of what the majority gleans from the record, and I agree that certain factors tend to favor a finding that defendant was in custody while other factors tend to favor a finding that defendant was not in custody. But I disagree with certain of the trial court's descriptions and characterizations (some of which are adopted by the majority), and this ultimately compels me to reach a different conclusion.

-1-

For example, and as the majority accurately notes, with respect to the "location of the questioning" factor, defendant agreed to speak with police officers at the police station rather than in the yard of his missing girlfriend's home; defendant was transported to the station, unrestrained, in the backseat of a police vehicle. Moreover, the prosecution indicated that detectives offered defendant a ride "out of convenience" and that he accepted. However, the trial court stressed not only that defendant "was not given the opportunity" to ride with Greenway,[1] but even more significantly, that defendant "was not *allowed* to travel to the station with Greenway" (emphasis added). In my judgment, this verbiage pejoratively suggests—without support in the record—that police officers denied a request by defendant to travel to the station with Greenway. What the record instead indicates is that officers offered defendant a ride, and he accepted the offer—nothing more, nothing less. Defendant did not have a vehicle of his own, and he did not even know Greenway. Defendant also could have reasonably believed that a ride with Greenway would not have been free of charge. Defendant had just met Greenway the day before, and knew him as someone who drove people places for money—or in defendant's case, for a generator. I therefore glean little from the mere fact that defendant traveled to the station with the officers. The trial court further pejoratively characterized defendant's arrival at the police station—again without support in the record—as having been "removed from the car and escorted into the station by armed officers." Defendant was not, however, forcibly dragged from the police vehicle at gunpoint; to the contrary, after accepting the officers' offer of a ride, he then exited the vehicle upon arrival and accompanied them into the building. Again, nothing more, nothing less.

The trial court additionally acknowledged that the subsequent interview took place in an unlocked room (which, as the majority notes, had multiple doors from which people entered and exited freely), and that defendant's freedom of movement within the room was not restrained in any way. The majority properly discounts the balance of the trial court's analysis of this factor. Specifically, it rejected the trial court's suggestion that a police dog was used to intimidate defendant; to the contrary, the record reflects that defendant was a lover of dogs, that the dog became a subject of friendly conversation, and that defendant had a positive interaction with the dog. The majority also states:

> [W]e reject the trial court's assertion that: "The average person that is summoned to a police station to talk with a detective would not feel comfortable leaving the station until the discussion was terminated by that detective." Here, the trial court seems to infer that questioning a suspect in a police station, by itself, can provide a legal basis for a finding that a person is "in custody." Such a conclusion runs afoul of [*Oregon v Mathiason*, 429 US 492, 97 S Ct 711, 50 L Ed 2d 714 (1977)], and we therefore reject that portion of the trial court's analysis. *Mathiason*, 429 US at 494-495.

---

[1] Greenway had driven defendant to the house that day.

I conclude that, absent the taint left by the trial court's pejorative characterizations, there is little left of the "location of the questioning" factor that would weigh in favor of a finding of custody, except for that which the majority has itself rejected.

With regard to the duration of the questioning, the trial court purported to conclude that the 90-minute duration of the interview "does not weigh heavily in either direction," a finding with which the majority concurs. However, the trial court qualified its finding by stating as follows: "What this Court does find concerning about the duration of Defendant's questioning is that it persisted after Defendant twice mentioned a need for an attorney and requested that the interview end."[2] For reasons that I will elaborate upon later, this statement does not, in my judgment, accurately characterize the circumstances or the record. But the fact that the trial court found this "concerning about the duration of [the] questioning" suggests to me that the trial court did not in fact weigh the duration factor neutrally.

With regard to the supposedly inculpatory statements made during the interview,[3] I note that I am unable to discern from either the transcript or the video of the interview that defendant confessed to anything or even made a material admission, leaving me wondering whether this is much ado about nothing. I also must place the interview in context. At the time of defendant's interview, it had not been determined that any crime had been committed. To the contrary, the Calhoun County Sheriff's Department conducted a wellness check at the Calhoun County home of defendant's girlfriend, Amy Wienski, after her vehicle was discovered burned and abandoned in Genesee County. Although officers suspected foul play and executed a search warrant at the home, the fate and whereabouts of Wienski were then unknown. While officers were present at the home, defendant (who also lived there) arrived in a vehicle driven by Greenway. Defendant and the officers began conversing in the yard of the home and, as noted, defendant agreed to continue that conversation at the police station. *People v Barritt*, 318 Mich App 662, 665-670; 899 NW2d 437 (2017), vacated in part by 501 Mich 872 (2017) (footnotes omitted).

The trial court acknowledged that defendant was never told during the interview that he was not free to leave, and that he was told—albeit late in the interview—that he was not under arrest and that the interview could end at any time. However, the trial court stated:

> The transcript of the interview suggests that the initial questioning was not confrontational. However, as the interview progressed, the hostility in the room quickly escalated as the detectives repeatedly accused Defendant of being untruthful and demanded he change his statement.

---

[2] The majority similarly characterizes defendant as having "stated that he needed a lawyer." The majority does not, however, conclude or suggest that defendant unequivocally asserted or was denied his right to counsel.

[3] Except as noted, the officers present during the interview were Detective Steve Hinkley and Detective Bryan Gandy, although each of them stepped out of the interview room at times.

The trial court additionally described the interview as becoming "heated" and referred to "the aggressive nature of the questioning." Not exactly.

It is noteworthy in my mind that the trial court made its judgment about the interview based solely on the transcript of the interview, and that the trial court opted not to view the video of the interview. The trial court thus denied itself the benefit of the full flavor of the interview, inasmuch as the written transcript does not reflect such factors as tone, volume, atmosphere, and inflection. In my judgment, the failure to view the video of the interview contributed to the trial court errantly describing the actual nature of the interview.

The video of the interview demonstrates that for in excess of 53 minutes of its 90-minute duration (equating to 56 pages of a 90-page transcript), the discussion between defendant and the officers was entirely casual, conversational, and even friendly. They discussed such topics as dogs, cars, Wienski's animals (including a coatimundi, a baby mouse, and raccoons), ticks, insulation, and online dating sites, and defendant jokingly responded, "Beer. Coke.," when asked what he would like to drink. Defendant repeatedly expressed a desire to help the officers. At the 53:20 mark (page 55) of the interview, defendant stated that he had told the officers everything he could think of, and told Detective Hinkley that "If there's anything else *you* [Detective Hinkley] can think of, *please ask.*" (Emphases added). Detective Hinkley then expressed the view that defendant loved Wienski but that something had happened to her, and that he believed that defendant had some idea about what had happened. Hinkley later indicated at approximately the 59 minute mark (page 63) of the interview that he had reason to believe that defendant had driven Wienski's vehicle that weekend and that defendant was not being truthful about whether he had driven the vehicle. But even then the tone and tenor of the conversation remained calm, measured, and at times so soft-spoken that it was difficult to hear on the recording of the interview.[4] It was not aggressive in tone, hostile, demanding, or accusatory of a crime. Rather, officers expressed a belief that defendant had not done anything purposefully to harm Wienski, but that perhaps something had happened accidentally and that defendant knew something about what had happened.

As noted, the trial court also indicated that defendant twice "requested a lawyer," and that he "requested that the interview end," but that officers instead "continued to question Defendant" and to "accuse Defendant of lying." The inaccuracy of that description is best revealed, I think, by quoting from the transcript of the interview beginning at the 74:34 minute mark (page 79 of the 90-page transcript):

MR. BARRITT: Well, *I think I need a lawyer now.* You guys are trying to . . .

DETECTIVE HINKLEY: You're not under arrest or anything. You're not under arrest.

MR. BARRITT: Well, then why am I here then? I told you everything.

---

[4] Even when officers used profanity, they did so in a soft-spoken and conversational manner, not in an in-your-face or confrontational manner.

DETECTIVE HINKLEY: Yeah, you're not under arrest for anything.

MR. BARRITT: *So, if that's the case, we can finish then*?

DETECTIVE HINKLEY: *We can finish any time*. But what I'm saying to you is, here's the thing, *you can finish any time you want*. But, what I'm saying to you is . . .

MR . BARRITT: *I don't want to not finish it if it's going to hurt her*, but I'm not gonna continue down this path.

DETECTIVE HINKLEY: Well, here's the deal. You did something? Either you did something to her or an accident happened to her. That's what all this comes down to. It's an accident or you did it on purpose. Okay? I don't think you did it on purpose. I'm pretty sure you didn't do it on purpose because I'm pretty good at reading people. Okay? So, you're in the car, so you're lying about the car. You're lying about the car. Lying, lying, lying. Okay. That's just it, period. Okay? I mean, I know enough, I'm so positive about that, I will call you a liar to your face, and I don't do that to people. Okay? You lied, lied, lied. Okay? So, that means to me either you did something on purpose to her or something accidentally happened to her. Okay? Now, this is a real simple choice for you. Okay? All right? This is an accident or it's on purpose. Okay? You - you got to man up sometime in your life. You've got to man up and you've got to come to some type of reasonable situation from this. *Something happened. You know it happened. I know it happened.* I know you're lying about the car, dude. I know you're lying about the car. I – you're lying about the car, dude. I mean, I'd frickin' put my paycheck - I know you're lying about the car. Okay? So, that makes me - that troubles me about her. *I don't think you did it on purpose. I think it was an accident. All right, dude? I'm – I'm telling you, I'm pretty sure it was an accident. All right. You know it was an accident. I know it was an accident. What happened to her?*

MR. BARRITT: I don't know.

DETECTIVE HINKLEY: You do know.

MR . BARRITT: I don't know.

DETECTIVE HINKLEY: You definitely know.

MR. BARRITT: No, I don't.

DETECTIVE GANDY: John . . .

DETECTIVE HINKLEY: Just a second. I got to . . .

DETECTIVE GANDY: All right.

MR. BARRITT: I don't like where this is going, with - *it looks like I'm going to have to get a lawyer*, because you guys are trying to put something on me and I'm not gonna say anything that would incriminate me for anything.[5]

DETECTIVE GANDY: Okay. (Talking on phone) . . .

[Emphases added.]

The next approximately 7 minutes of the interview (and 4 pages of the transcript) consist not of continued questioning but of delays (filled with silence or side conversations) and casual discussion between defendant and Sergeant Brad Hall[6] relating to the police dog and defendant's dog. Eventually, the following exchange occurred:

SERGEANT BRAD: Yeah. Well, sometimes you got to get the other thing taken out. I mean, dogs are pretty important, make sure they're safe. But, probably the most important thing here is that - that we get this taken care of. Right?

MR. BARRITT: Well, yeah, absolutely. I did my part.

SERGEANT BRAD: Yeah. Well, so, you been helping those guys out pretty good?

MR. BARRITT : Yeah. As best I can.

SERGEANT BRAD: They're pretty good guys. I'll tell you what, if - if anybody can find her, they can. So, you know, they work hard and do a really good job. So, they're working - working for her and doing the best they can to find her and to straighten these things out. So, I been here for a lot of these kind of things. Never in charge - I'm not in charge of nothing. I just stand around, do things, sit here with you while they – while they, you know, discuss other information and things that might've come in, you know, in between and hang out. But, I'll tell you what, the truth always comes out.

---

[5] The United States Supreme Court has stated that "[f]idelity to the doctrine announced in *Miranda* requires that it be enforced strictly, but only in those types of situations in which the concerns that powered the decision are implicated." *Berkemer v McCarty*, 468 US 420, 437; 104 S Ct 3138; 82 L Ed 2d 317 (1984). These concerns involved the impairment of a defendant's "free exercise of his privilege against self-incrimination." *Id*. This statement from defendant actually exercising that privilege shows that, although the interview took place at a police station, defendant did not appear to believe that "questioning [would] continue until he provide[d] his interrogators the answers they seek." *Id*. at 438.

[6] Sergeant Hall was not present for the earlier portion of the interview, but entered the interview room to sit with defendant while Detective Hinkley stepped out of the room to speak to Detective Gandy.

MR . BARRITT: Um-hum.

SERGEANT BRAD: You know what I mean?  So, I guess it's one of those things if you - the sooner the truth comes out, the easier it is to - to deal with, you know what I mean?

MR. BARRITT: Um-hum.

SERGEANT BRAD: So, that's why it's really important.  Sometimes people go all hardcore and whatever, and they - they wait until the very last second and it kind of makes 'em look really bad.  So, it's best to - best to - to, I don't know, I guess you just want to make sure that - you seem like a really nice guy.  You want to make sure that you're as truthful as possible because - because you know, it's going to be rough otherwise.  You see what I mean?

MR. BARRITT: Um-hum.

SERGEANT BRAD: So, I don't know, that's just the only advice that I can give ya.  It's always, always - it's always, always, no matter what situation you're in, it's always best to tell the truth.  It's hard to stick with a lie.

MR. BARRITT: Um- hum.

SERGEANT BRAD: And then a lot of things, you know what I mean, when they're in here - when they're in here talking to you, they - they know the answer to 75 percent of the questions they ask.

MR. BARRITT: Um-hum.

SERGEANT BRAD: So, then they're kind of judging - judging your truthfulness or things that they can verify.

MR. BARRITT: Um-hum.

SERGEANT BRAD: So - and if you're being truthful, you got nothing to worry about.  If not, then you - I don't know, you got something else you need to say, you probably ought - probably ought to get it out.

MR. BARRITT: Um-hum.

SERGEANT BRAD: Okay? So, there's only one way to straighten these things out, you know?  So . . .

At the 87:25 mark (page 87) of the interview, Detective Gandy re-entered the room, and the following colloquy ensued:

DETECTIVE GANDY: All right. Well, we got a phone call from Mt. Morris PD. And they want to talk to you.

MR. BARRITT: Okay.

DETECTIVE GANDY: All right?

MR. BARRITT: Yup.

DETECTIVE GANDY: You are - we're going to meet Mt. Morris PD.

MR. BARRITT: All right. Where?

DETECTIVE GANDY: 94 near - and you're going to go with them.

MR. BARRITT: All right.

SERGEANT BRAD: Listen, John, before you go, is there anything else that you want to tell 'em? We talked for a second. I know you got something else there. I can see it written all over your face.

MR. BARRITT: No.

SERGEANT BRAD: You can't stick with it forever, bud. You can't even say it.

MR. BARRITT: I don't know what more to say.

SERGEANT BRAD: Just got to say - say the truth. Say what happened.

MR. BARRITT: I don't know what happened.

SERGEANT BRAD: Okay.

At that point, defendant was handcuffed[7] for purposes of transporting him to the Mt. Morris police for further questioning.

The record thus reflects that defendant's references to a need for counsel were equivocal, that defendant did not request that the interview end, and that defendant in fact indicated that he did not wish for the interview to end if it would hurt Wienski. And, in any event, other than Detective Hinkley asking defendant what had happened (in the context of Detective Hinkley's expressed belief that defendant knew more than he was saying) and Sergeant Hall later advising defendant to tell the truth and asking defendant whether there was anything else he wanted to say, officers did not "continue to question" defendant. Rather, the interview ended.[8]

---

[7] Detective Gandy stated, "we can't transport you without being restrained, for safety reasons."

[8] In any event, the prosecution asserts that "[t]he People do not seek to admit any statements made by Defendant after the point that defendant was restrained or at which he asserted his rights to cease questioning or to have an attorney present. Nonetheless, the statements made by

With regard to the presence or absence of physical restraints during the questioning, the trial court properly found that "the lack of handcuffs and unlocked doors weigh toward a finding that Defendant was not in custody." However, the court went beyond the contours of the factor itself to reiterate its view that defendant had been "required" to ride in the police vehicle, that he was "escorted" into the station "by armed officers," that during the interview he was always "in the presence of at least one armed officer," that the interview became "heated," and that the police officers had used a police dog as a coercive tactic. The trial court therefore concluded that "[w]hile not technically a physical restraint, there was an obvious threat of force employed by the officers," and that it was reasonable to believe that "the purpose of this threat of force was to discourage Defendant's movement and force him to talk." For the reasons already described, I disagree with those characterizations, and therefore with the trial court's employment of them in assessing the "physical restraint" factor.

Finally, the trial court accurately notes that after the interview, "Defendant was handcuffed and transported to the Mt. Morris Police Department where he was formally arrested." And indeed, whether an interviewee is released at the end of the questioning is considered under the caselaw to be one of the factors to consider in assessing whether the interviewee was "in custody." See, e.g., *Howes*, 565 US at 509; *Yarborough*, 541 US at 664. However, I agree with our concurring colleague in this Court's first review of this case that this factor "seems somewhat anomalous, as it does not touch on the events of the interrogation itself." See *Barritt*, 318 Mich App at 683-684 (GLEICHER, J., concurring), citing Pettinato, *The Custody Catch–22: Post–Interrogation Release as a Factor in Determining Miranda Custody*, 65 Ark. L. Rev. 799, 818 (2012) ("One oddity that has resulted from the general lack of clarity in *Miranda* custody jurisprudence is the consideration of post-interrogation arrest or release in the totality-of-the-circumstances test."). I also do not believe that the mere fact that an interviewee is not released after initial questioning (so that the questioning may continue in another jurisdiction) should override the noncustodial nature of the initial questioning.

For all of these reasons, and viewing the entirety of the record, I conclude that in light of all of the objective circumstances surrounding defendant's interrogation, a reasonable person would not have felt that he was not at liberty to terminate the interrogation and leave. *Barritt*, 501 Mich at 872. Moreover, I conclude that the environment surrounding the interrogation did not present the same inherently coercive pressures as the type of station house questioning involved in *Miranda*. *Id*.

Accordingly, I would reverse the trial court's order granting defendant's motion to suppress.

/s/ Mark T. Boonstra

---

Defendant up to that point in time were voluntary and he was not restrained or in custody. It is those initial statements that the People seek to admit in their case in chief against Defendant."