# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-23-00650-CR

**Jeffrey Shaw, Appellant**

**v.**

**The State of Texas, Appellee**

### FROM THE 483RD DISTRICT COURT OF HAYS COUNTY
### NO. CR-21-4393-C, THE HONORABLE TANNER NEIDHARDT, JUDGE PRESIDING

### M E M O R A N D U M  O P I N I O N

Jeffrey Shaw appeals his possession-of-a-controlled-substance conviction, arguing the trial court should have suppressed his unwarned statements. We affirm.

### BACKGROUND

During a search of the vehicle in which Shaw had been traveling, an officer found a plastic baggie of "Superman" pills which he believed to be the street drug MDMA (ecstasy). The officer held up the baggie and asked Shaw and his female passenger, "What's up with these pills—what's up with this?" Both answered, at the same time, that someone had given the baggie to them. About ten minutes later, and after a field test had confirmed the substance, the same officer asked Shaw and the female, "Whose are these?" The female responded, "They were given to us." After some back and forth between the officer and the female, the officer asked, "This belongs to both of y'all then?" Shaw answered, "It belongs to both of us but, like, it was given to us—we were

just in Austin." Officers then arrested them both. Shaw was charged with the offense of possession of a controlled substance. *See* Tex. Health & Safety Code § 481.116(d). He filed a motion to suppress his unwarned statements. The only evidence considered by the trial court was the first-to the-scene officer's body cam footage. Based on that footage, the trial court held that Shaw was not in custody when the officer asked the questions and therefore denied the motion to suppress. Shaw pleaded guilty to the charged offense, and the trial court placed him on deferred-adjudication community supervision for three years and allowed him to appeal this pre-trial suppression ruling.

### *Custody*

#### *Applicable Law and Standard of Review*

A statement that is the product of a custodial interrogation is admissible only if the warnings required by *Miranda* and article 38.22 are given prior to the statement. *Miranda v. Arizona*, 384 U.S. 436, 444–45 (1966); Tex. Code Crim. Proc. art. 38.22 § 3. It is the defendant's initial burden to show that a statement was the product of a custodial interrogation. *Herrera v. State*, 241 S.W.3d 520, 526 (Tex. Crim. App. 2007). The determination of custody is made "on an ad hoc basis," considering all objective circumstances. *Id*. at 532.

We first ask whether a reasonable person would have felt he or she was free to end the interrogation and leave. *Howes v. Fields*, 565 U.S. 499, 509 (2012). If a reasonable person would not have felt free to end the interrogation and leave, then we ask a second question: "whether the relevant environment presents the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*." *Id*. At least four circumstances "may constitute custody: (1) when the suspect is physically deprived of his freedom of action in any significant way, (2) when a law enforcement officer tells the suspect that he cannot leave, (3) when law enforcement

officers create a situation that would lead a reasonable person to believe that his freedom of movement has been significantly restricted, and (4) when there is probable cause to arrest and law enforcement officers do not tell the suspect that he is free to leave." *Dowthitt v. State*, 931 S.W.2d 244, 255 (Tex. Crim. App. 1996). For the first three circumstances to constitute custody, "the restriction upon freedom of movement must amount to the degree associated with an arrest as opposed to an investigative detention." *Id*. For the fourth circumstance to constitute custody, probable cause must be manifest—either related to or acknowledged by the suspect—and the combined circumstances must "lead a reasonable person to believe that he is under restraint to the degree associated with an arrest." *Id*. In all situations, the determination of whether custody exists "depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." *Stansbury v. California*, 511 U.S. 318, 323 (1994) (per curiam).

We review a trial court's ruling on a motion to suppress for an abuse of discretion. *See State v. Cortez*, 543 S.W.3d 198, 203 (Tex. Crim. App. 2018). The party that prevailed in the trial court is afforded the strongest legitimate view of the evidence, and all reasonable inferences that may be drawn from that evidence. *State v. Garcia-Cantu*, 253 S.W.3d 236, 241 (Tex. Crim. App. 2008). Because the matter of whether Shaw was in custody when he was questioned is a mixed question of law and fact that does not turn on credibility or demeanor, we apply (1) a deferential standard of review to the trial court's factual assessment of the circumstances surrounding the interrogation, and (2) a de novo review to its ultimate legal determination that Shaw was in custody. *State v. Saenz*, 411 S.W.3d 488, 494 (Tex. Crim. App. 2013); *State v. Ortiz*, 382 S.W.3d 367, 372 (Tex. Crim. App. 2012).

*Application*

The body cam video shows that, on an August night, around 3:00 a.m., a San Marcos Police Department Officer stopped to get gas. He noticed, one pump over, a maroon sedan with bullet holes on the back passenger-side panel. He also observed that the male in the driver's seat (Shaw) and the female in the passenger seat had their seats reclined all the way and were asleep. After calling in the license plate and waiting for backup, and at about the 5:15 mark into the body cam footage, multiple officers shined their flashlights in the car until the occupants woke up. One officer said, "Police, Police, Police." At the 6:15 mark, the vehicle doors opened (though it is hard to tell if the occupants or the officers opened them) and the officers asked the occupants if they were okay. They, rather sleepily, said they were. They were asked to step out of the car.

Shaw, who was in his boxers, put his jeans, which were down at his feet, back on. Shaw and the female stepped to the back of the car and the officer asked why they were sleeping in the car. Shaw said they were travelling back to San Antonio and had just stopped for gas. There were five officers altogether, but none had weapons drawn. Asked about the bullet holes in the car, the female explained that she had been shot in the legs while trying to get to her car outside a club in Alamo Heights. She said it happened back in June. One officer said, "the bullet holes in the car, man, they piqued our interest."

Two officers, included the one wearing the body cam, focused on the car, shining their flashlights around. The female told them her identification was in the arm rest. The passenger-side officer searched through the compartment but could not find it. He then searched through her purse. Around the 9:00 mark, the two officers discussed a faint smell of marijuana. Because the officer was struggling to find the identification, the female came back to the car and

4

leaned inside the driver's side and found her identification and handed it to the passenger-side officer.  She then returned to the back of the car.

At the 10:05 mark, the driver-side officer (the one wearing the body cam) tossed a baggie of loose pills onto the roof and asked the passenger's side officer what he thought they were.  The officers agreed they were "Superman Pills" or MDMA.  The driver-side officer later stated he found them in plain view.

At the 10:50 mark, the driver-side officer held the baggie up and asked Shaw and the female, "What's up with these pills, what's up with this?"  Both answered that someone had given the baggie to them.  The officer said they were going to "test it real quick" to see what it was.  The officers then fully searched the car—at some point finding a small amount of marijuana.  When the officers ran into trouble getting the trunk open, Shaw helped them.  Around the 17:00 mark, yet another officer showed up with a test kit.

At the 20:00 mark, the officer who did the field test stated the result as "pretty blue" and "positive."  At the 21:51 mark, the driver-side officer walked over with the pills and asked Shaw and the female, "Whose are these?"  The female said, "They were given to us."  The officer asked, "They were given to both of y'all?"  The female nodded.  The officer said he knew it was "straight up ecstasy MDMA."  The female said, "we don't do those though," "You can test our blood," "We are sorry, I didn't know what it was."  The officer again asked, "This belongs to both of y'all then?"  Shaw then answered, "It belongs to both of us but, like, it was given to us, we were just in Austin."  The female said, "throw them out, I don't care."  Instead, at 22:36 mark, the officer said, "No we are going to put y'all under arrest."

As Shaw argues, his freedom of movement was immediately restricted when he was awakened by police officers; a reasonable person in Shaw's situation would have perceived

5

himself as not free to break off the confrontation by starting the car and leaving the scene. *See Howes*, 565 U.S. at 509. There were three or four patrol vehicles and four or five officers present. Officers asked them to step out of the car and to stand away from the car while officers looked in the car. Two officers shined flashlights in the car while two other officers stood with Shaw and the female.

Shaw argues that the evidence was also sufficient to show that he was in custody. According to Shaw, there was probable cause to arrest him, and law enforcement officers did not tell him or the female that they were free to leave. And the probable cause was manifest; it was related to him when the officer "hoisted the baggie into the air." So, when the officer asked, "What's up with these pills—what's up with this?" it was objectively apparent that Shaw was in custody. *Dowthitt*, 931 S.W.2d at 255.

Shaw likens his case to *Ortiz*, where the Court of Criminal Appeals held that, by the time Ortiz made the statements that he and his wife were carrying cocaine, the objective circumstances would have led a reasonable person to believe that his liberty was compromised to a degree associated with formal arrest. *Ortiz*, 382 S.W.3d at 373. Specifically, by then (1) the leading officer had expressed his suspicion to Ortiz that he had drugs in his possession, asking "How much drugs are in the car?"; (2) two additional law enforcement officers had arrived on the scene; (3) Ortiz and his wife had both been patted down and handcuffed; and (4) the officers had manifested their belief to Ortiz that he was connected to some sort of (albeit, as-yet undisclosed) illegal or dangerous activity on his wife's part by asking "What kind of drugs does your wife have?" *Id*. at 370, 373.

The State points to unpublished cases where courts have held that when an officer asks multiple people about drugs to investigate whose they are, a reasonable person among the

6

group would not think he or she is under restraint to the degree associated with an arrest. The State also distances the facts in this case from those in *Ortiz*. Here, officers directed all questions to both Shaw and his passenger at the same time; never separated them; did not pat them down; did not apply handcuffs; and allowed Shaw and his passenger relatively free movement. Officers also kept the scene relatively non-confrontational and courteous. According to the State, a reasonable person in Shaw's shoes would not have believed that he was under restraint to the degree associated with an arrest; instead, a reasonable person would have understood that the officers, who had thrown out a general inquiry, "What's up with these pills?" to both occupants of the car, and had notified them that they were going to field test the pills, would have understood that "the investigation was ongoing and not a *fait accompli*." State's Br. 25; *see State v. Waldrop*, 7 S.W.3d 836, 839 (Tex. App.—Austin 1999, no pet.).

We agree with the State's argument. Viewing the body-cam footage in the light most favorable to the trial court's ruling, as the standard of review requires us to do, supports the trial court's legal conclusion that a reasonable person in Shaw's situation would have believed he was detained, rather than arrested, at the time of the question, "What's up with these pills?" and Shaw and the female passenger both answered that someone had given the baggie to them. The officer said they were going to test it to see what it was "real fast." Even when the officers came back after the field test, it was not objectively clear that the officers would place both Shaw and the female in custody; a reasonable person could conclude that the officers would place the one asserting possession in custody. They had probable cause, *see Maryland v. Pringle*, 540 U.S. 366,

7

372 (2003), but asking who the baggie belonged to, to ascertain who had actual care, control and management over the contraband, objectively signaled that this was an ongoing investigation.[1]

We therefore conclude that the trial court did not abuse its discretion in denying Shaw's motion to suppress the statements that led to his arrest. We overrule his sole issue.

**CONCLUSION**

Having overruled Shaw's sole issue, we affirm the judgment of the trial court.

_____

Chari L. Kelly, Justice

Before Chief Justice Byrne, Justices Triana and Kelly

Affirmed

Filed: August 21, 2025

Do Not Publish

---

[1] The State argues that the trial court was not asked whether Shaw was in custody at the time of the second question, but under the circumstances here, Shaw's argument that he was in custody at the time of the first question necessarily encompassed an argument that he was in custody at the time of the second question.

8