**Affirmed and Memorandum Opinion filed October 2, 2018.**



In the

# Fourteenth Court of Appeals

## NO. 14-16-00957-CR

**JEFFERY SOLOMON, Appellant**

**v.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 183rd District Court
Harris County, Texas
Trial Court Cause No. 1503633**

## M E M O R A N D U M   O P I N I O N

A jury convicted appellant Jeffery Solomon of murder. *See* Tex. Penal Code § 19.02 (West 2018). Appellant appeals his conviction, arguing the trial court erred by: (1) overruling appellant's motion for instructed verdict; (2) admitting a recording of appellant's "custodial interrogation"; and (3) admitting appellant's text conversation and alleged solicitation of a "web cam girl." We affirm.

# I. BACKGROUND

Appellant was charged with the murder of complainant Darius Gatlin. At trial, the State adduced the following evidence through testimony and exhibits.

Complainant, a man, sometimes dressed as a woman and worked as a prostitute. Complainant lived in an apartment with two roommates, Howard and Lemelle. Around midnight on September 10, 2015, complainant left the apartment in his Nissan Maxima dressed as a woman.

Meanwhile, at 12:29 a.m. on September 11, 2015, appellant initiated a text conversation with a "web cam girl" named "Julia." Appellant attempted to send her a payment. After he failed to pay with a credit card, Julia asked him to purchase her an Amazon gift card instead. Because they were "going to meet up," appellant offered to give her cash. Julia insisted on receiving the gift card. Appellant kept Julia waiting. Julia sent appellant a photo and asked, "[S]o interested or not?" Appellant replied, "Yes[,] you are . . . sexy." However, by 2:34 a.m., appellant had not sent money or a gift card to Julia and he stopped communicating with her. Appellant also contacted other "females" that morning, trying unsuccessfully to "hook up."

At 3:17 a.m. on September 11, 2015, complainant texted his roommate Howard and told her to "[o]pen d door but play sleep under d cover." Howard testified this meant complainant was "coming over with somebody." Cell tower data indicated that complainant's phone and appellant's phone were both in the same area near complainant's home between 3:18 a.m. and 3:34 a.m. Both phones then moved away from that location.

At approximately 4:15 a.m., both phones were located near 12302 Tamborine Drive, an address associated with appellant's friend, Dennis DeVon Ennis Thompson, who appellant referred to as "D Mac" or "Little D." Cell phones

2

associated with Thompson and appellant's brother, T.J. Wade, were also located near the same address at that time. Between 4:00 a.m. and 4:30 a.m. that morning, complainant's roommate Lemelle called complainant to complain about work. Complainant answered his phone. Lemelle testified that at the beginning of their conversation, complainant "sounded like a girl" but after "a little other conversation, he started talking normally." Then the call disconnected. Lemelle tried to call complainant back, but his call went straight to voicemail. Neither Howard nor Lemelle ever heard from complainant again.

On September 12, 2015, Howard reported complainant missing.

Ten days later, on September 22, 2015, Houston Police Department (HPD) Officers Medina and Baker were on patrol when they observed appellant driving a Nissan Maxima without a seatbelt. Medina ran the Maxima's license plate number to determine its registered owner and search for warrants. His search revealed the vehicle's registered owner was a missing person, complainant. The officers stopped the vehicle, and as they approached, Medina observed appellant's demeanor as "nervous, scared, [and] fidgety." Appellant initially identified himself to Medina as complainant, "Darius Gatlin." However, when Medina searched the vehicle, he discovered a Texas identification card with a photo of appellant and appellant's name. When Medina further questioned appellant about the identity of Darius Gatlin, appellant told Medina that complainant was his "play uncle." Medina asked appellant if he knew where complainant was, and appellant gave Medina some addresses off Troulon. Medina subsequently arrested appellant for possession of a controlled substance. At Medina's request, officers checked the addresses appellant had provided but were unable to locate complainant.

On September 23, 2015, Officers Frayre and Clayburn of the HPD Missing Persons Division interviewed appellant in jail, where he was being held for

3

possession of a controlled substance. Frayre and Clayburn were investigating complainant's missing person case. During the interview, appellant repeatedly told the officers that hours prior to his arrest on September 22, 2015, he saw complainant and complainant agreed to briefly loan him the Maxima. He claimed complainant was his "homeboy" that he knew "from the neighborhood" for "2 ½ to 3 weeks." He also said the first time he saw complainant, complainant was with appellant's "homeboy D Mac" at a club off Bissonnet. Appellant expressed disbelief that officers had visited the addresses he had previously identified off Troulon (a duplex): "I don't even think that they went to the right spot." He said that since he met complainant at the club, complainant had "been coming by" the neighborhood. Appellant told Frayre that he could tell her where complainant was "right now." Appellant then told Frayre that complainant was staying at a house a few houses down from his own on Troulon. Appellant claimed his mother would confirm that complainant had been hanging around his house and his brother would confirm that he had asked complainant to borrow the car.

Frayre and Clayburn drove out to Troulon but did not find complainant.

On September 26, 2015, and October 2, 2015, appellant called women from jail and urged them to relay messages to his brother. In the first call, appellant said, "There's some shit I need to make sure is secure while I'm here though because I'm not trying to have nothing pop up while I'm sitting in here." Appellant asked the woman to give the following message to his brother "word for word":

> Tell him: when I call his ass again, and he don't pick up, when I get out of here I'm going to kick his ass . . . . Tell him he know besides what . . . I'm tryin' to call him for. Tell him if that shit backtrack and hit me while I'm in here, I'm going to get out, and I'm gonna kill him . . . . And do say: I'm gonna kill you.

4

In the second call, appellant said:

> I need you to get another phone right now and call T.J. Like this is like a real emergency . . . . I need you to call T.J. like right now . . . . This is like, like, you don't know how serious this is right now, crucial . . . . I can't say it over the phone . . . . Alright, look. . . . Tell him, tell him to go check on that money. If he don't understand what that is, tell him . . . X marks the spot, I guess. If he don't know what . . . that is . . . tell him to go digging . . . . Tell him it's state of emergency. Tell him this is like no joke. Tell him my life hangs on, hangs on everything right now . . . . I can't get into detail. Tell him if he don't do what the hell I'm saying . . . tell him to go on a treasure hunt. Tell him to link up with D Mac and go finish what we started.

On October 17, 2015, three teenage boys discovered partially-buried human remains in a wooded area in Alief Community Park. One of the boys testified that he had smelled "something dead" in the area for a month or two. The boys called the police, and HPD Crime Scene Unit Officer Menefee responded to the scene. Sergeant Holbrook of HPD's Homicide Division spoke to the media and distributed a press release about the discovery.

The next day, appellant called his brother and told him he had "seen some [expletive] . . . on the news . . . . Just another treasure hunt was found." His brother responded, "Hey, I went out, umm, but I couldn't find that . . . . I been everywhere." Then appellant instructed his brother to "start stacking up on some bread." His brother agreed and said "I can't even like think of nothing in that house that [unintelligible]. We detailed that house so good." Appellant responded, "I'm like, that's exactly what I said, bro. I was like, bro, we cleaned this out like two times . . . . How . . . did y'all find some [expletive] in the car that we couldn't find?"

An autopsy was conducted on the remains. The autopsy report stated the remains were "in an advanced state of decomposition." A forensic pathologist

concluded that the deceased individual had suffered blunt force injuries to his skull and sharp force injuries to his ribs, "indicating multiple stab wounds" at or near the time of death. The death was ruled a homicide. A forensic entomologist examined the insects in the remains and concluded that black soldier flies colonized the deceased individual's remains between September 13 and 18, 2015, meaning death occurred on or before September 18, 2015.

Before the identity of the remains was determined and before a suspect was identified, Holbrook secured surveillance footage of the wooded area where the remains were discovered from a resident who lived nearby. The resident informed Holbrook that he had observed tire tracks in the yard behind his house on September 11 and 12, 2015. He further informed Holbrook that he had reviewed the surveillance footage from that time, and he directed Holbrook to some suspicious footage. The footage showed a vehicle parking behind the resident's house and turning off its lights at 12:02 a.m. on September 12, 2015. At 12:07 a.m., the vehicle backed up to the wooded area. At 1:04 a.m., the vehicle pulled out of the resident's driveway and drove away. Holbrook determined that the vehicle was a 2012 to 2014 Nissan Maxima. Holbrook then contacted the Crime Analysis Unit and provided information that the victim was probably a cross-dresser and there had been a 2012 to 2014 Nissan Maxima in the area. In response, the analyst provided Holbrook with a report identifying complainant, who had gone missing and drove a Nissan Maxima. The remains were later identified as complainant's remains through DNA comparison.

Homicide investigators subsequently received cellular tower data that placed appellant's phone in the area where complainant's remains were found at approximately 12:07 a.m. on September 12, 2015. Holbrook also received documentation showing that appellant sold complainant's phone at a kiosk at

2:00 p.m. on September 11, 2015.

On November 1, 2015, HPD Crime Scene Unit Officer Duncan processed complainant's vehicle, which had been recovered from appellant's possession. Duncan observed grass in the vehicle's tailpipe, which he testified was an indication that the vehicle had moved backward into tall grass. Duncan also found a pair of shoes in appellant's size on the rear floorboard of the vehicle.[1] Duncan observed that the shoes and the trunk of the vehicle reacted to a chemical spray which indicated the presence of blood. Duncan swabbed the shoes and the trunk, and the swabs were later submitted for DNA testing. The DNA information obtained from the shoe and the trunk matched complainant's DNA profile.[2]

Frayre and Clayburn interviewed appellant a second time on November 6, 2015. Appellant changed his story. This time, appellant claimed he borrowed complainant's vehicle from his friend "Little D," not complainant. He also claimed that he had only seen complainant twice: once at the club and once in the neighborhood. After Frayre and Clayburn questioned appellant, Holbrook and his partner continued the interview. Appellant reiterated that he had only seen complainant twice and told Holbrook the last time he saw complainant was September 15, 2015.

The jury convicted appellant of murder. The trial court assessed appellant's

---

[1] Appellant wore a size ten and a half or eleven shoe while complainant wore shoes two sizes smaller.

[2] Houston Forensic Science Center DNA Analyst Davis testified that complainant could not be excluded as the person whose blood was on the shoe and in the trunk. With respect to the DNA obtained from the blood on the shoes, Davis testified: "The probability that a random, unrelated individual would also be included is approximately 1 in 39,000 for Caucasians; 1 in 14,000 for African-Americans; and 1 in 6,200 for Southwest Hispanics." With respect to the DNA obtained from the trunk, Davis testified: "The statistics are approximately 1 in 16 sextillion for Caucasians; 1 in 1.2 sextillion for African-Americans; and 1 in 28 sextillion for Southwest Hispanics."

punishment at forty years' confinement in the Texas Department of Criminal Justice – Institutional Division. Appellant timely appealed.

## II.  ANALYSIS

### A.  Sufficiency of the evidence

In his first issue, appellant contends the trial court erred in overruling appellant's motion for instructed verdict. A challenge to the trial court's ruling on a motion for an instructed verdict is a challenge to the sufficiency of the evidence to support the conviction. *Williams v. State*, 937 S.W.2d 479, 482 (Tex. Crim. App. 1996). Appellant contends the evidence is insufficient to support his conviction because it fails to show that he (a) caused the death of appellant or (b) had the specific intent to kill.

#### 1.  Standard of review and applicable law

When reviewing the sufficiency of the evidence to support the jury's guilty verdict in a criminal case, we consider whether "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010). Under this standard, "*all of the evidence* is to be considered in the light most favorable to the prosecution." *Jackson*, 443 U.S. at 319. Courts of appeals consider all evidence in the record, whether admissible or inadmissible, to make this determination. *Winfrey v. State*, 393 S.W.3d 763, 767 (Tex. Crim. App. 2013). "Although we consider everything presented at trial, we do not reevaluate the weight and credibility of the evidence or substitute our judgment for that of the fact finder." *Price v. State*, 456 S.W.3d 342, 347 (Tex. App.—Houston [14th Dist.] 2015, pet. ref'd) (citing *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007).

"It is not necessary that the evidence directly prove defendant's guilt; circumstantial evidence is as probative as direct evidence in establishing the guilt of the actor, and circumstantial evidence alone may be enough to establish guilt." *Carrizales v. State*, 414 S.W.3d 737, 742 (Tex. Crim. App. 2013). The jury is permitted "to draw multiple reasonable inferences as long as each inference is supported by the evidence presented at trial." *Hooper v. State*, 214 S.W.3d 9, 15 (Tex. Crim. App. 2007).

A person commits murder when he "intends to cause bodily injury and commits an act clearly dangerous to human life that causes the death of an individual." Tex. Penal Code § 19.02(b)(2). Identity of the guilty party may be proven by direct evidence, circumstantial evidence, or reasonable inferences made from available evidence. *Gardner v. State*, 306 S.W.3d 274, 285 (Tex. Crim. App. 2009). Intent may be determined from a defendant's words, acts, and conduct, and "is a matter of fact, to be determined from all of the circumstances." *Smith v. State*, 965 S.W.2d 509, 518 (Tex. Crim. App. 1998). "A person acts intentionally . . . when it is his conscious objective" to commit the act or cause the result. Tex. Penal Code § 6.03(a) (West 2018).

### 2. Sufficient evidence

Appellant argues there is no direct evidence that he committed or participated in complainant's murder. Appellant also contends "the evidence presented at trial was insufficient to prove Appellant's intent to kill" complainant. In support of these arguments, appellant asserts "no forensic evidence connects him with the murder" and "[n]o witnesses place him at the scene of the homicide." Appellant argues there is no testimony regarding how long complainant had been dead when appellant was arrested in complainant's car. Appellant argues although cell phone records show his phone was used in the area where complainant's

9

remains were discovered, they do not prove appellant killed complainant or that appellant was using the phone.

As noted above, direct evidence is not required. In addition, we do not engage in a "divide and conquer approach, separating each piece of evidence offered to support Appellant's conviction, followed by speculation on the evidence the State did not present." *Merritt v. State,* 368 S.W.3d 516, 526 (Tex. Crim. App. 2012) (internal citations omitted). Instead, we consider the "combined and cumulative force of the evidence." *Id.*

The combined and cumulative force of the evidence supports the jury's conclusion that appellant murdered complainant. Several circumstances tend to show appellant's identity as the perpetrator. Appellant had possession of complainant's car and cellphone, which tends to support his identity as the murderer. When appellant was pulled over in complainant's car, he initially claimed to be complainant. Surveillance video showed suspicious footage of a 2012 to 2014 Nissan Maxima—the same make and model appellant was found driving—close to the wooded area where complainant's remains were found. Cell tower data showed appellant's cell phone was near the wooded area at the same time. Blood matching complainant's DNA profile was found in the trunk of the car and on shoes the same size as shoes worn by appellant.

Appellant changed his story regarding his familiarity with complainant and his communications with complainant. Appellant initially claimed to have seen complainant and borrowed the Maxima from him on September 22, 2015, while evidence showed complainant died days before September 22, 2015. Appellant later claimed he asked his friend "Little D", not complainant, to borrow the car. Appellant initially claimed he often saw complainant around the neighborhood but later claimed he only saw complainant twice.

10

Cell tower data showed appellant's phone close to complainant's phone and complainant's residence on the night of complainant's disappearance. Appellant sold complainant's cell phone on the same day complainant disappeared. In jail calls, appellant made multiple incriminating statements from which the jury could have inferred appellant knew where complainant's body was buried. In addition, appellant's phone call with, and failed attempts to pay, and meet up with, a "web cam girl" Julia on the night of complainant's disappearance could supply a motive for the crime. Jurors could have reasonably inferred that appellant solicited complainant to "hook up" and became upset when he discovered complainant was a male. The text conversation with Julia also showed that appellant was in possession of his cell phone at or near the time of complainant's disappearance. Viewing all the evidence in the light most favorable to the verdict, a rational trier of fact could have found beyond a reasonable doubt that appellant committed an act clearly dangerous to human life that caused complainant's death.

We also conclude sufficient evidence exists that appellant intentionally caused complainant's bodily injury and death. "[T]he extent of the injuries to the victim, the method used to produce the injuries, and the relative size and strength of the parties" may be used to infer intent to kill. *Herrera v. State*, 367 S.W.3d 762, 771 (Tex. App.—Houston [14th Dist.] 2012, no pet.) (citing *Patrick v. State*, 906 S.W.2d 481, 487 (Tex. Crim. App. 1995)). Evidence shows complainant suffered multiple blunt force and sharp force injuries at or near the time of his death. At trial, the forensic pathologist testified that one of the blunt force injuries complainant suffered was consistent with complainant being struck with an object with a small surface area, such as a hammer or a crowbar. The forensic pathologist further testified that the injuries to complainant's ribs were consistent with stabbing and cutting injuries from a beveled weapon, such as a knife. From these

facts, the jury could have reasonably inferred that appellant had the requisite specific intent to cause complainant's bodily injury and death. Sufficient evidence exists that appellant intentionally caused complainant bodily injury and committed an act clearly dangerous to human life that caused complainant's death. We overrule appellant's first issue.

## B. Custodial interrogation

In his second issue, appellant contends the trial court erred by allowing the State to introduce as evidence the recording of the appellant's September 23, 2015 interview.[3] Appellant asserts that he was in "custody" but was not given the warnings required by *Miranda v. Arizona*[4] and article 38.22 of the Texas Code of Criminal Procedure prior to this interview.

### 1. Standard of review and applicable law

*Miranda* warnings and article 38.22 requirements are mandatory only when there is a custodial interrogation. *Herrera v. State*, 241 S.W.3d 520, 526 (Tex. Crim. App. 2007). The meaning of "custody" is the same for purposes of *Miranda* and article 38.22. *Id.* The defendant bears the initial burden to prove that a statement was the product of a custodial interrogation. *Id.* The State has no burden to show compliance with *Miranda* unless and until the record as a whole clearly establishes that the defendant's statement was the product of a custodial interrogation. *Id.*

"In reviewing a trial court's ruling on a *Miranda*-violation claim, an appellate court conducts a bifurcated review: it affords almost total deference to the trial judge's rulings on questions of historical fact and on application of law to

---

[3] Appellant mistakenly asserts this interview took place on September 22, 2015.

[4] 384 U.S. 436 (1966).

fact questions that turn upon credibility and demeanor, and it reviews de novo the trial court's rulings on application of law to fact questions that do not turn upon credibility and demeanor." *Alford v. State*, 358 S.W.3d 647, 652 (Tex. Crim. App. 2012). The custody issue is reviewed de novo when, as here, questions of historical fact do not turn on the credibility and demeanor of the witnesses. *See Herrera*, 241 S.W.3d at 527. We view the evidence presented in the light most favorable to the trial court's ruling. *State v. Kelly*, 204 S.W.3d 808, 818 (Tex. Crim. App. 2006).

Generally, a person is considered to be in custody for purposes of *Miranda* and article 38.22 when: (1) the person is formally arrested; or (2) the person's freedom of movement is restrained to the degree associated with a formal arrest. *Nguyen v. State*, 292 S.W.3d 671, 677 (Tex. Crim. App. 2009). However, for a person who is already an inmate of a prison or jail, "the question turns on whether, under the facts and circumstances of the case, 'a reasonable person would have felt that he or she was not at liberty to terminate the interrogation and leave.'" *Id.* at 678 (quoting *Miranda*, 384 U.S. at 532). An inmate is not in custody per se. *See id.* In *Herrera v. State*, the Texas Court of Criminal Appeals listed the factors to be considered in determining whether an inmate is in custody: (1) the language used to summon the inmate; (2) the physical surroundings of the interrogation; (3) the extent to which the inmate is confronted with evidence of his or her guilt; (4) the additional pressure exerted to detain the inmate or the change in the surroundings of the inmate which results in an added imposition on the inmate's freedom of movement; and (5) the inmate's freedom to leave the scene and the purpose, place, and length of the questioning. 241 S.W.3d at 532.

## 2.     No custody

Appellant first contends his September 23, 2015 interview was a custodial

interrogation because Frayre believed appellant to be a suspect in the disappearance of complainant and was trying to "develop a case against" him. Being the "focus" of an investigation does not necessarily render a person "in custody" for purposes of receiving *Miranda* warnings or those required under article 38.22 of the Code of Criminal Procedure. *Gardner*, 306 S.W.3d at 293. As noted above, the proper inquiry is whether a reasonable person would have felt that he was not at liberty to terminate the interrogation and leave. *Nguyen*, 292 S.W.3d at 678. "The subjective belief of law enforcement officials about whether a person is a suspect does not factor into our 'custody' determination unless an official's subjective belief was somehow conveyed to the person who was questioned." *Herrera*, 241 S.W.3d at 525–26. In this case, appellant does not argue or reference any evidence showing that Frayre communicated to appellant he was a suspect. We therefore do not weigh Frayre's belief as a factor in our custody determination.

Appellant next argues that the mere fact that he was in jail rendered him in "custody" and entitled him to *Miranda* and article 38.22 warnings. Appellant acknowledges that "the case law in this area has favored the holding that some showing of additional restraint or impairment of freedom is required to trigger the necessity of *Miranda* warnings" but argues the case law is wrong, stating "appellate courts have chosen to dismiss the reality of that imprisonment in favor of creating a somewhat fanciful world where inmates are allowed to move about at will."

The case law is clear that for a person who is in jail or prison on a separate offense, incarceration does not automatically constitute custody for purposes of *Miranda* or article 38.22. *See Herrera*, 241 S.W.3d at 525–26, 532; *Sloan v. State*, 418 S.W.3d 884, 889–90 (Tex. App.—Houston [14th Dist.] 2013, pet ref'd) (citing *Howes v. Fields*, 565 U.S. 499 (2012)). We are bound to follow the precedent of

14

the Court of Criminal Appeals and our own precedent. *See Gardner v. State*, 478 S.W.3d 142, 147 (Tex. App.—Houston [14th Dist.] 2015, pet. ref'd); *Caddell v. State*, 123 S.W.3d 722, 726–27 (Tex. App.—Houston [14th Dist.] 2003, pet. ref'd); *Prieto v. State*, 879 S.W.2d 295, 300 (Tex. App.—Houston [14th Dist.] 1994, pet. ref'd). We reject appellant's invitation to do otherwise.

Appellant cites the *Herrera* factors for determining whether an inmate is in custody for purposes of *Miranda* but does not reference any evidence relevant to the factors or provide any analysis applying the factors in this case. Additionally, we have reviewed the record and do not see sufficient evidence to support a finding that the September 23, 2015 interview was a custodial interrogation under the *Herrera* factors. As such, appellant has failed to meet his initial burden to establish he was in custody for purposes of *Miranda* and article 38.22. *See Herrera*, 241 S.W.3d at 532 ("[T]he record shows that [appellant] failed to meet his initial burden of establishing that he was 'in custody' for *Miranda* purposes. Beyond the purpose of the questioning . . . the record is devoid of any facts relating to the factors relevant to determining 'custody' for purposes of *Miranda* in this context."). Appellant's second issue is overruled.

## C.  Admissibility of text conversation with Julia

In his third issue, appellant contends the trial court erred by admitting evidence of the September 11, 2015 text conversation between him and Julia because it "included irrelevant and inflammatory evidence whose probative value was outweighed by its prejudicial nature" (emphasis omitted).

### 1.  Standard of review and applicable law

We review the trial court's decision to admit evidence for abuse of discretion. *Moses v. State*, 105 S.W.3d 622, 627 (Tex. Crim. App. 2003); *Hedrick*

*v. State*, 473 S.W.3d 824, 829 (Tex. App.—Houston [14th Dist.] 2015, no pet.). "If the ruling was correct on any theory of law applicable to the case, in light of what was before the trial court at the time the ruling was made, then we must uphold the ruling." *Sifuentes v. State*, 494 S.W.3d 806, 815 (Tex. App.—Houston [14th Dist.] 2016, no pet.) (citing *Martin v. State*, 173 S.W.3d 463, 467 (Tex. Crim. App. 2005). We uphold a trial court's ruling on the admissibility of evidence "as long as the ruling was within the zone of reasonable disagreement." *Id.*

Evidence of an extraneous act "is not admissible to prove a person's character in order to show on a particular occasion the person acted in accordance with this character." Tex. R. Evid. 404(b)(1). However, such evidence "is admissible when the extraneous act is: (1) relevant to a fact of consequence in the case aside from its tendency to show action in conformity with character and (2) its probative value is not substantially outweighed by the danger of unfair prejudice." *Hedrick*, 473 S.W.3d at 829; *see* Tex. Rs. Evid. 401, 402, 403, 404(b).

Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence and (b) the fact is of consequence in determining the action. Tex. R. Evid. 401. Texas Rule of Evidence 404(b)(2) provides that evidence of an extraneous act may be relevant to prove "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Such evidence also may be admissible to rebut a defensive theory. *Moses*, 105 S.W.3d at 626.

Even if the extraneous evidence is relevant, the trial court may properly exclude it under rule 403 if its probative value is substantially outweighed by the danger of unfair prejudice, misleading the jury, undue delay, or needlessly presenting cumulative evidence. Tex. R. Evid. 403. "When Rule 403 provides

16

that evidence 'may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice,' it simply means that trial courts should favor admission in close cases, in keeping with the presumption of admissibility of relevant evidence." *Montgomery v. State*, 810 S.W.2d 372, 389 (Tex. Crim. App. 1990) (quoting Tex. R. Evid. 403).

When conducting a rule 403 analysis, courts must balance: (1) the inherent probative force of the proffered item of evidence, along with (2) the proponent's need for that evidence, against (3) any tendency of the evidence to suggest decision on an improper basis, (4) any tendency of the evidence to confuse or distract the jury from the main issues, (5) any tendency of the evidence to be given undue weight by a jury that has not been equipped to evaluate the probative force of the evidence, and (6) the likelihood that presentation of the evidence will consume an inordinate amount of time or merely repeat evidence already admitted. *Gigliobianco v. State*, 210 S.W.3d 637, 641–42 (Tex. Crim. App. 2006) (citing, amongst others, *Montgomery*, 810 S.W.2d at 389–90).

We review the trial court's decision to admit evidence for abuse of discretion and defer to the trial court's determination of whether evidence of an extraneous act has relevance apart from character conformity and whether the probative value is substantially outweighed by the danger of unfair prejudice. *Hedrick*, 473 S.W.3d at 829 (citing *Moses*, 105 S.W.3d at 627).

## 2. Relevance

We first consider whether the text conversation was relevant aside from its tendency to show action in conformity with character. Appellant asserts his text conversation with Julia "had no connection to the murder case whatsoever and therefore was not relevant." Appellant asserts the State used this evidence "solely to cast Appellant in a negative light and the jurors were improperly provided with

harmful evidence of Appellant's bad character." Appellant argues there was no evidence that he had engaged complainant as a prostitute.

The State contends that appellant's text conversation with Julia was relevant to prove appellant's motive and identity as complainant's murderer. We agree. The jury could have reasonably inferred from the text conversation that appellant was trying to meet with a female prostitute during the early morning hours of September 11, 2015. The jury also could have reasonably inferred that because appellant was unable to meet with Julia due to his inability to pay her electronically, he sought out another prostitute. Appellant himself testified that he had contacted other "females" that morning, trying unsuccessfully to "hook up." Complainant's roommate testified that complainant was known to work as a prostitute, that complainant was known to be posing as a female during the early morning hours of September 11, 2015, and that complainant's text to Howard suggested he was bringing someone to his apartment. The evidence showed complainant's cell phone was in the same location as appellant's that morning. In combination with this evidence, the text conversation supports a reasonable inference that appellant solicited complainant as a prostitute in his search for a "female" to "hook up" with. The text conversation also supports a reasonable inference regarding appellant's motive for killing complainant—shock in discovering that complainant was not female. Evidence of appellant's solicitation of Julia is further relevant because it tends to make appellant's identity as complainant's killer more probable than without the evidence. Evidence of the text conversation was therefore relevant aside from its tendency to show action in conformity with character.

### 3. Not unfairly prejudicial

Having determined the text conversation was relevant, we evaluate whether

18

the probative value of the evidence substantially outweighed the danger of unfair prejudice under rule 403. Appellant contends the trial court erred in admitting the evidence because any probative value it had was outweighed by a danger of unfair prejudice. Appellant provides no discussion of the rule 403 balancing test; he simply makes assertions that the evidence was used "to arouse hostility or anger toward the appellant," and the "highly inflammatory" nature of the evidence confused the issues in the case.

We conclude that the rule 403 "factors overall weigh more strongly in favor of admission." *Hedrick*, 473 S.W.3d at 831. The trial court reasonably could have found the inherent probative force of the evidence was strong. The text conversation with Julia provided evidence of motive and identity, and as such, it provided significant context to other evidence presented. The trial court also reasonably could have found that the State's need for the evidence was considerable. The State did not have other compelling evidence showing why complainant and appellant came together or why appellant would have killed complainant. The evidence presented to the jury did not repeat any evidence already admitted and did not consume an inordinate amount of time during the trial.

In addition, the evidence was not so inflammatory or prejudicial that it suggested a verdict on an improper basis. While the evidence of appellant's text conversation with Julia may have been inflammatory on its own, compared to the charged offense of murder and the body of evidence at trial connecting appellant to complainant's murder, the evidence of the text conversation was unexceptional. Further, the trial court gave a proper limiting instruction regarding extraneous conduct to the jury, lessening the prejudicial impact of the evidence. *See Banks v. State*, 494 S.W.3d 883, 894 (Tex. App.—Houston [14th Dist.] 2016, pet. ref'd).

We therefore conclude that the danger of unfair prejudice did not substantially outweigh the probative value of the contested evidence. The trial court did not abuse its discretion in admitting evidence of the text conversation with Julia. We overrule appellant's third issue.

### III. CONCLUSION

Having overruled all of appellant's issues, we affirm the judgment of the trial court.

/s/    Marc W. Brown
Justice

Panel consists of Justices Busby, Brown, and Jewell.

Do Not Publish — TEX. R. APP. P. 47.2(b).