

## Fourth Court of Appeals
### San Antonio, Texas

## MEMORANDUM OPINION

No. 04-23-00070-CR

Nakelia S. **JOHNSON**,
Appellant

v.

The **STATE** of Texas,
Appellee

From the County Court at Law No. 13, Bexar County, Texas
Trial Court No. 678012
Honorable Rosie S. Gonzalez, Judge Presiding

Opinion by:    Beth Watkins, Justice

Sitting:    Beth Watkins, Justice
Liza A. Rodriguez, Justice
Lori I. Valenzuela, Justice

Delivered and Filed: April 10, 2024

AFFIRMED

Appellant Nakelia S. Johnson appeals her deadly conduct conviction, arguing the trial court erred in denying her motion to suppress, motion to quash, and request for a jury instruction. We affirm.

### BACKGROUND

The evidence at trial established that Johnson's husband, Devin Johnson, called 9-1-1 to request police after Johnson pointed a gun at him. Officers responded to the call and ultimately arrested Johnson. The State later charged her with deadly conduct. The jury returned a guilty

verdict and the trial court sentenced Johnson to one year in jail, then probated her sentence for twelve months.

## ANALYSIS

### *Motion to Suppress*

Johnson first argues that the trial court erred in denying her motion to suppress because her statements to the officers were the product of custodial interrogation conducted without the safeguards provided by *Miranda v. Arizona* and article 38.22 of the Texas Code of Criminal Procedure.

#### *Background of the Motion to Suppress*

Before trial, Johnson filed a motion to suppress evidence of the statements she made to the responding officers "after her constructive arrest" and before she received the warnings required by *Miranda* and article 38.22. At the pretrial hearing, Johnson's counsel explained, "Judge, I would stipulate that this is a warrantless arrest, and that - - and the burden would then be shifted to the [S]tate." The State responded that Johnson "was not free to leave; however, she was being detained for the purposes of . . . investigator's safety as well as public safety. They had not - - they had not arrested her at that point." There was confusion about which party had the burden to present evidence about whether Johnson was detained to such a degree that *Miranda* and article 38.22 warnings were required. The court made a preliminary ruling denying the motion to suppress and noted, "I haven't seen the video. . . . No one has proffered it so far as an exhibit. . . ." The State then played two videos: (1) Officer Marcus Lara's body-cam video from 2:36:48 to 2:38:50; and (2) Officer Brittany Gonzales's body-cam video from 2:38:32 to 2:42:03. Although the trial court and parties viewed those videos, they were not offered as exhibits at the pretrial hearing. They were, however, admitted at trial, where Johnson reurged the motion to suppress, and both parties have relied on the trial exhibits in their appellate briefing. For that reason, we will do the same.

*See Ford v. State*, 305 S.W.3d 530, 539 (Tex. Crim. App. 2009) ("A trial judge may use his discretion in deciding what type of information he considers appropriate and reliable in making his pre-trial ruling.") (citing Tex. Code Crim. Proc. Ann. art. 28.01).

**Video 1 (State's Trial Exhibit 1)**

| | |
|---|---|
| 2:36:48 | Four officers arrive using flashlights to illuminate the night. They perform a sweep of the area and discuss the plan to "Ask if the person will come out and talk to us." They turn towards Johnson's apartment and see that the front door is open, the exterior light is on, but the inside of the apartment is dark. As they approach the open front door, an officer reports, "She has a baby in her hands." An agitated Johnson stands at the threshold holding the couple's toddler and talking on the phone. The scene is chaotic and loud, with multiple voices talking over each other. |

2:37:32    Johnson:    Wow, they brought four police officers, mom. Four police officers. They have - -

2:37:36    Officer Lara walks between cars in the parking lot and approaches Johnson's apartment.

Officer Lara:  Hey there ma'am. - -

Johnson:    four police officers, mom. - -

Officer Lara:  Hey, where's the gun at?

Johnson:    [unintelligible] four police officers.

2:37:42    Officer Lara climbs the steps to Johnson's apartment.

Officer Lara:  Hey hold up. Hey, where's the gun at?

Johnson:    The gun?

Officer Lara:  Yeah. Where's the gun at?

Johnson:    It's put up.

Officer Lara:  OK. Where is it?

2:37:49    Officer Lara crosses the threshold into the apartment. The light in the inside entryway is off, but the light is on inside the kitchen to the right side of the screen. Johnson is standing with a toddler in her arms in the doorway

between the kitchen and the entry. Devin stands near her with a cell phone and a bottled water in his hands. Johnson is clearly upset.

Johnson:  It's - - act - - it's - - it's with his stuff.

Devin tries to give the phone to Johnson.

Devin:  Hey, talk to your momma.

2:37:53  Devin leans forward to place a cell phone on a bench in the entryway. He then stands facing Johnson and an older child stands by his side. An unintelligible voice projects through the cell phone.

Johnson:  No, talk to my mom. I'm going to jail. Remember, you called the cops to put me in jail.

Officer Lara: Everything OK ma'am?

Johnson:  No, everything is not ok. I asked him to leave. He didn't want to leave. So.

Officer Lara: Ok. Hey my man. Go ahead and hand the kid over real quick.

Johnson:  To him?

Officer Lara: Yeah.

Johnson:  For what?

Officer Lara: Go ahead, ma'am. Just go ahead and hand him over.

Johnson:  You can - - You can answer the question.

Officer Lara: We'll talk to you right now, ma'am.

Johnson:  I know, but why am I handing my son over to him?

Officer Lara: Do you have another kid you can give him to?

Johnson:  No. I just want to know. Why can't we talk with my son in my hands?

Officer Lara: We'll go ahead and detain you for now, alright ma'am.

Johnson:  Ok, but what are you detaining me for?

Devin:          [Unintelligible] that's what I told her.

Officer Lara:   OK. We'll talk to you in a second my man.

Johnson:        Devin, come grab - - Come grab him. - -

2:38:26   A different officer begins to remove the toddler from Johnson's hands. The scene becomes increasingly chaotic with sounds coming from the phone, the toddler crying, and Johnson raising her voice.

Johnson:        Come grab him, Devin. Come grab him. Come grab him, Devin. [unintelligible]

Officer Lara:   We're gonna detain you for now. We're just gonna detain you for now.

Johnson:        You don't have to detain me - -

Officer Lara:   OK, I understand that.

Johnson:        We can have a conversation.

Officer Lara:   Absolutely.

Johnson:        Uh, I know my rights. Here we go. - -

2:38:31   Johnson's hands appear behind her back and Officer Abraham Esquivel handcuffs her.

Johnson         Y'all detaining me for no reason.

Officer Lara:   You've got no firearm—nothing on you, right?

2:38:44   Officer Esquivel begins to walk Johnson out the front door.

Johnson:        Nope. Devin got four cops on me and they taking me outside. [unintelligible]

Officer Lara:   Talk to her out there, we'll talk to him in here.

2:38:50   Officer Lara remains inside; his audio ends.

## Video 2 (State's Trial Exhibit 7)

2:38:32   This video shows the events described above from a different angle.

2:38:45    Officer Gonzales stands outside the front door as a handcuffed Johnson walks past.

     Johnson:      Why are they taking me outside when it's cold. I can't get a jacket? I can't get a jacket? I can't get a jacket? - -

2:38:52    Devin is inside holding the crying toddler and speaking to Officer Lara.

2:38:54    Gonzales turns to follow Johnson.

     Johnson:      . . . don't have to detain me. I didn't fight back or nothing. But y'all are detaining me for no reason because I'm Black. Let's do this. I love it. A Black woman in Texas, being detained for nothing.

2:39:10    Officer Esquivel escorts Johnson, with her hands cuffed behind her back, while holding her left elbow higher than her right elbow, so her body bends to the right.

     Johnson:      You don't have to do that sir. You can go ahead and lower your arms. [unintelligible] It's alright, I'm not going to resist you or anything. OK.

2:39:12    Officer Esquivel stands Johnson in front of a marked police SUV with its headlights on.

     Officer Esquivel: [unintelligible]

     Johnson: [unintelligible] What?

     Officer Esquivel: [unintelligible] are not tight enough on your wrists so I'm gonna double up.

2:39:23    Officer Esquivel begins to place a second set of handcuffs on Johnson.

2:39:26    Officer Gonzales: Ma'am, what's going on tonight?

     Johnson:      My husband didn't feed our child. I asked him to leave. He didn't want to leave. And now we're here.

     Officer Gonzales:     Y'all are married?

     Johnson:     Yes, we're married.

     Officer Gonzales:     How long have y'all been married?

     Johnson:     Five years.

Officer Gonzales:     OK. So what's the deal with the gun? Or how did that come into play?

Johnson:     I asked him to leave. He didn't want to leave.

Officer Gonzales:     OK.

Johnson:     So I point- - I pointed the gun at him.

Officer Gonzales:     You pointed the gun.

Johnson:     Yes.

Officer Gonzales:     What kind of gun is it?

Johnson:     I don't know. You'd have to ask him.

2:39:47     Officer Esquivel begins to turn Johnson around so she is facing away from the SUV. Officer Esquivel stands approximately three feet to Johnson's left, illuminating the scene with a light from his shoulder. Officer Gonzales stands approximately the same distance away on her right. Johnson's voice has become more passive and steady.

Officer Gonzales:     It's his gun?

Johnson:     Yes it's his.

Officer Gonzales:     OK. When- - So you actually pointed it at him? - -

Johnson:     Yes.

Officer Gonzales:     You raised it up and pointed it at him?

Johnson:     Yes. I asked him to leave because he didn't want to leave.

Officer Gonzales:     Did you tell him anything when you were raising the gun besides that you were wanting him to leave?

Johnson:     I asked him - - Yeah. I said can you please leave.

Officer Gonzales:     Ok. So - -

Johnson:     Please leave.

Officer Gonzales:     After that, what did you do?

Johnson: Nothing. He called the cops. So I picked up my son. I told him not to touch my children. And we'll wait for the cops to get here.

Officer Gonzales: You put the gun away after that?

Johnson: Yeah. I put the gun away because I already knew you guys were about to take me to jail. So, might as well.

2:40:23 Johnson shifts her weight to lean against the SUV. Gonzales asks a series of questions, including about Johnson's identity, her children, and whether she and Devin had been having problems lately. During the course of this questioning, Johnson's demeanor has become calm.

2:41:44 Officer Gonzales: I understand that you're upset ma'am but you can't be pointing guns at people, OK?

Johnson: You're right.

Officer Gonzales: And that's the reason you are detained right now, OK.

Johnson: You're right.

Officer Gonzales: Did anything difficult else physical happen? It was all just an argument and you pointed the gun?

Johnson: Yep.

Officer Gonzales: OK. Alright. Just stand by for me, OK? You don't have any weapons on you right now?

Johnson: Nope.

Officer Gonzales: Anything sharp that is going to poke or stick me?

Johnson: Nope.

Officer Gonzales: OK. Just stand by, OK?

Officer Gonzales's audio ends.

*Applicable Law and Standard of Review*

A statement that is the product of a custodial interrogation is admissible only if the warnings required by *Miranda* and article 38.22 are given prior to the statement. *Miranda v.*

*Arizona*, 384 U.S. 436, 444–45 (1966); TEX. CODE CRIM. PROC. ANN. art. 38.22, § 3. It is the defendant's initial burden to show that a statement was the product of a custodial interrogation. *Herrera v. State*, 241 S.W.3d 520, 526 (Tex. Crim. App. 2007). The determination of custody is made "on an ad hoc basis," considering all objective circumstances. *Id*. at 532.

We first ask whether a reasonable person would have felt he or she was free to end the interrogation and leave. *Howes v. Fields*, 565 U.S. 499, 509 (2012). To answer this first question, we examine "all of the circumstances surrounding the interrogation"—"the location of the questioning, its duration, statements made during the interview, the presence or absence of physical restraints during the questioning, and the release of the interviewee at the end of the questioning." *Id.* (internal quotation marks and citations omitted). If a reasonable person would not have felt free to end the interrogation and leave, then we ask a second question: "whether the relevant environment presents the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*." *Id*. At least four circumstances "may constitute custody: (1) when the suspect is physically deprived of his freedom of action in any significant way, (2) when a law enforcement officer tells the suspect that he cannot leave, (3) when law enforcement officers create a situation that would lead a reasonable person to believe that his freedom of movement has been significantly restricted, and (4) when there is probable cause to arrest and law enforcement officers do not tell the suspect that he is free to leave." *Dowthitt v. State*, 931 S.W.2d 244, 255 (Tex. Crim. App. 1996). For the first three circumstances to constitute custody, "the restriction upon freedom of movement must amount to the degree associated with an arrest as opposed to an investigative detention." *Id*. For the fourth circumstance to constitute custody, probable cause must be manifest—either related to or acknowledged by the suspect—and the combined circumstances must "lead a reasonable person to believe that he is under restraint to the degree associated with an arrest." *Id*.

"A trial court's ruling on a motion to suppress is reviewed for abuse of discretion and should be reversed only if it is outside the zone of reasonable disagreement." *Wexler v. State*, 625 S.W.3d 162, 167 (Tex. Crim. App. 2021). "Custody is a mixed question of law and fact that does not turn on credibility and demeanor unless the witness testimony, if believed, would always decide the custody question." *Id*. "We apply a bifurcated standard of review, giving almost total deference to the trial court's factual assessment of the circumstances surrounding the questioning and reviewing *de novo* the ultimate legal determination of whether the person was in custody under those circumstances." *Id*. "When a trial court denies a motion to suppress and does not enter findings of fact, we view the evidence in the light most favorable to the ruling and assume the trial court made implicit findings of fact that support its ruling as long as those findings are supported by the record." *Id*. "The party that prevailed in the trial court is afforded the strongest legitimate view of the evidence, and all reasonable inferences that may be drawn from that evidence." *Id*.

*Application*

Johnson argues law enforcement created a situation that would have led a reasonable person to believe that her freedom of movement had been significantly restricted. She argues:

- officers immediately put her into handcuffs even though they could see she was unarmed and holding a baby;

- officers informed her that she was being detained;

- she stated aloud that she was aware she was likely getting arrested and going to jail;

- officers escorted her to the police vehicle, put a second set of handcuffs on her, and interrogated her for half an hour; and

- officers never told her she would be free to leave.

We agree that Johnson's freedom of movement was restricted here. *Howes*, 565 U.S. at 509. Despite this, the State argues Johnson failed to meet the second part of the test to show that she

was in custody. According to the State, a reasonable person in Johnson's shoes would not have believed that she was under restraint to the degree associated with an arrest; instead, a reasonable person would have understood that the officers sought simply to "maintain the status quo" by separating the fighting couple, moving Johnson away from the children, and investigating the incident involving a gun that was yet to be located. In contrast, Johnson argues that all the circumstances, including those above, signaled to her that she could not leave. She also argues that probable cause to arrest her existed before the questioning, and everyone involved knew that.

The trial court viewed the body-cam videos, including "what would become State's Exhibit 1 from embedded time stamp 2:36:50 through 2:38:50, and what would become State's Exhibit 7 from 2:38:32 through 2:42:03." Immediately after watching those few seconds of video, the trial court denied the motion to suppress.

As described above, officers told Johnson they were detaining her; she acknowledged out loud that she was being detained and argued it was for no reason. After officers asked two questions, Johnson described pointing the gun at Devin, thereby providing information substantiating probable cause. *Dowthitt*, 931 S.W.2d at 255. She also said, "I put the gun away because I knew you guys were going to take me to jail." As the State notes, Johnson said this after making the incriminating statement.

We agree with the State that, viewing the video segments in the light most favorable to the trial court's ruling, as the standard of review requires us to do, a reasonable person in Johnson's situation would have believed she initially was detained, rather than arrested, because she was repeatedly told she was being detained and she acknowledged it. *See Howes*, 565 U.S. at 515 (recognizing communicated non-custodial status as important factor in determining whether detained person is in custody). Although officers restrained Johnson with handcuffs, "[t]here is no bright-line test providing that mere handcuffing is always the equivalent of an arrest." *Balentine*

- 11 -

*v. State*, 71 S.W.3d 763, 771 (Tex. Crim. App. 2002) (handcuffing of suspect reasonably necessary to ensure officer safety while investigating shots-fired call). Indeed, specific facts supported the objective reasonableness of that restraint—she had reportedly just pointed a gun in an apartment she shared with her husband and their two small children, the gun had not been found, and she was argumentative and agitated, and the situation was volatile before the officers placed her in handcuffs and removed her from the apartment. *See id*. Viewed objectively, the officers diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly while ensuring the safety of all involved. *See United States v. Sharpe*, 470 U.S. 675, 685–86 (1985) ("In assessing whether a detention is too long in duration to be justified as an investigative stop [rather than a *de facto* arrest], we consider it appropriate to examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant."). Within minutes, Johnson confirmed the officers' suspicions—turning their reasonable suspicion into probable cause—and they arrested her.

When viewing the evidence under the governing standard of review, the strongest legitimate view of the evidence shows that this investigative detention was necessary to ensure safety in responding to a 9-1-1 call involving a gun. We therefore conclude that the trial court did not abuse its discretion in denying Johnson's motion to suppress the statements that led to her arrest. *Wexler*, 625 S.W.3d at 167; *Balentine*, 71 S.W.3d at 771; *Sharpe*, 470 U.S. at 685–86. We overrule her first issue.

### *Motion to Quash*

Johnson next argues that the information was not supported by a sufficient complaint.

### *Applicable Law*

The Texas Court of Criminal Appeals described the requirements of charging instruments in *State v. Drummond*. 501 S.W.3d 78 (Tex. Crim. App. 2016). "To initiate the prosecution of a

Class A misdemeanor, as was charged in this case, the State must present an information or an indictment within two years of the commission of the offense." *Id*. at 81 (citing TEX. CODE CRIM. PROC. ANN. art. 12.02(a)). "An information cannot be presented, however, unless it is filed with a complaint." *Id.* (citing TEX. CODE CRIM. PROC. ANN. art. 21.22). The "complaint" is "a prerequisite to an information." *Id.* "A complaint to support an information is a sworn affidavit, duly attested to by the district or county attorney, that is made 'by some credible person charging the defendant with an offense.'" *Id*. (quoting TEX. CODE CRIM. PROC. art. 21.22); *State v. Yakushkin*, 625 S.W.3d 552, 555 (Tex. App.—Houston [14th Dist.] 2021, pet. ref'd) (Texas law does not require that a complaint supporting an information include sufficient facts to establish probable cause). The sufficiency of a charging instrument is a question of law. *Hughitt v. State*, 583 S.W.3d 623, 626 (Tex. Crim. App. 2019). We therefore review a ruling on a motion to quash challenging the sufficiency of the charging instrument under a de novo standard. *Id*.

*Application*

The complaint alleged that on or about January 27, 2022, Johnson committed the offense of "530013 MA DEADLY CONDUCT-FAMILY." The information alleged that "on or about the 27th Day of January, 2022, NAKELIA S JOHNSON, did recklessly engage in conduct that placed DEVIN MICHAEL JOHNSON, a member of the defendant's family and household, in imminent danger of serious bodily injury by pointing a gun at and in the direction of complainant[.]" At the pretrial hearing, Johnson argued that the complaint was not sufficient to support the information because the complaint, unlike the information, did not allege the facts of the offense and described the offense in "an abbreviated incomplete sentence." Johnson agreed with the trial court that the complaint and information, when read together, provided sufficient notice to develop a defense. Johnson nevertheless asked the trial court to quash the documents because "they don't comply with the pleading requirements set by the legislature and the higher courts."

- 13 -

In *State v. Caves*, this court addressed a similar argument. 496 S.W.3d 153 (Tex. App.—San Antonio 2016, pet. ref'd). There, the complaint alleged "CHARLES CAVES committed the offense of FAIL GIVE NOTICE UNATTENDED VEHICLE" but little else, including whether the offense was a Class B or Class C misdemeanor. *Id.* at 155, 158. We held that because the complaint failed to allege an offense, it was inadequate to support the information. *Id.* at 158. But we found the probable cause affidavit filed to support the request for the arrest or search warrant was "sufficient to meet the requisites of article 15.05," and therefore "sufficient to support the information." *Id.* at 159. Article 15.05 applies to complaint affidavits filed to obtain a warrant to arrest. *See Drummond*, 501 S.W.3d at 81. But we agreed with the State that such an affidavit could nevertheless support an information. *Caves*, 496 S.W.3d at 156–59 (citing similar cases and noting that standard for judging sufficiency of a complaint underlying an information is less stringent than for affidavit forming the basis of arrest or search warrant).

Our opinion in *Caves* predated the Court of Criminal Appeals's opinion in *Drummond*, but it is consistent with *Drummond*—each court examined the clerk's record for the presence of "all of the necessary ingredients of both an information and complaint." *See Drummond*, 501 S.W.3d at 82–83; *Caves*, 496 S.W.3d at 156–59. Here, when the information and complaint are considered together, they contained all the necessary ingredients. *See* TEX. CODE CRIM. PROC. art. 21.20 ("Information"); art. 21.21 ("Requisites of an information"), art. 21.22 ("Information based upon complaint").[1] Unlike in *Caves*, the complaint designated the class of the offense as "MA," which the trial court interpreted as a Class A misdemeanor, sufficiently placing Johnson on notice of the

---

[1] The complaint even meets article 15.05. It: (1) states the name of the defendant, "NAKELIA S JOHNSON"; (2) states "the affiant has good reason to believe and does believe" that the defendant committed the offense of "530013 MA DEADLY CONDUCT-FAMILY"; (3) states the time, "on or about the 27th Day of January 2022," and place, "County of Bexar and State of Texas," of the commission of the offense; and (4) is signed by the affiant. TEX. CODE CRIM. PROC. art. 15.05.

specific alleged offense. Johnson argues here that the "MA" did not adequately allege that the offense is a misdemeanor, and the "FAMILY" designation does not make sense when looking at the statute, which makes no mention of family. But at the pretrial hearing, Johnson acknowledged the complaint provided notice that the offense was a Class A misdemeanor and focused on the complaint's lack of any factual allegation.

*Drummond* clarifies that the governing statutes require the complaint supporting the information to charge the defendant with an offense. They do not require the complaint to state the elements of the offense. Johnson relies on *Williams v. State*, where the Court of Criminal Appeals held a complaint that failed to allege every element of the offense was insufficient to support the information. 107 S.W.2d 996, 997 (Tex. Crim. App. 1937) ("It will be observed that the complaint omits to charge that appellant 'knowingly' exposed the fuel for sale, and likewise omitted to allege that the pumps were not labeled 'Inferior Motor Fuel' as well as many other averments found in the information. The latter is good, the complaint is fatally defective."). But the Court of Criminal Appeals's opinion in *Drummond*, nearly sixty years later, limited *Williams*'s reach, and now "the supporting-complaint statute simply requires an 'affidavit . . . made by some credible person charging the defendant with an offense.'" *Drummond*, 501 S.W.3d at 82. Because that threshold was met here, we overrule Johnson's argument that the complaint could not support the information. *Hughitt*, 583 S.W.3d at 626; *Drummond*, 501 S.W.3d at 81; *Caves*, 496 S.W.3d at 159; *Yakushkin*, 625 S.W.3d at 555.

### Jury Instruction

Johnson's third and final argument is that the trial court erred in denying her request to include the definition of "imminent" in the court's charge.

*Applicable Law*

The trial court must deliver to the jury "a written charge distinctly setting forth the law applicable to the case[.]" TEX. CODE CRIM. PROC. ANN. art. 36.14. The "law applicable to the case" includes "the statutory definitions that affect the meaning of the elements of the offense." *Ouellette v. State*, 353 S.W.3d 868, 870 (Tex. Crim. App. 2011). "To ensure compliance with Article 36.14, a trial judge should, as a general rule, avoid including non-statutory instructions in the charge because such instructions frequently constitute impermissible comments on the weight of the evidence." *Beltran De La Torre v. State*, 583 S.W.3d 613, 617 (Tex. Crim. App. 2019). "[S]pecial, non-statutory instructions, even when they relate to statutory offenses or defenses, generally have no place in the jury charge." *Walters v. State*, 247 S.W.3d 204, 211 (Tex. Crim. App. 2007). Rather, "[w]here terms used are words simple in themselves, and are used in their ordinary meaning, jurors are supposed to know such common meaning and terms and under such circumstances such common words are not necessarily to be defined in the charge to the jury." *Druery v. State*, 225 S.W.3d 491, 509 (Tex. Crim. App. 2007) (internal quotation marks omitted).

The first question in analyzing a jury-charge issue is whether the charge contains error. *Ngo v. State*, 175 S.W.3d 738, 743 (Tex. Crim. App. 2005). If the charge contains error in the omission of an instruction, we analyze that error for harm. *Casanova v. State*, 383 S.W.3d 530, 533 (Tex. Crim. App. 2012). "The degree of harm necessary for reversal depends on whether the appellant preserved the error by objection." *Ngo*, 175 S.W.3d at 743. If preserved, error requires reversal if we find some harm. *Id*. If not, error requires reversal if we find egregious harm. *Id.* at 743–44.

*Application*

Johnson requested that the jury be instructed that "imminent" means "ready to take place, near at hand, impending, hanging threateningly over one's head, menacingly near." The State

opposed the request, noting the danger that the definition could be an improper comment on the evidence, and cited *Cormier v. State*, 540 S.W.3d 185 (Tex. App.—Houston [1st Dist.] 2017, pet. ref'd). In *Cormier*, the First Court of Appeals held that the trial court acted within its discretion when it refused to submit a requested definition of "imminent" because the term is not defined in the Texas Penal Code and has a common meaning. *Id*. at 192.

Johnson argued that the definition he requested—"ready to take place, near at hand, impending, hanging threateningly over one's head, menacingly near"—had been used by the Court of Criminal Appeals in a child endangerment sufficiency evaluation. *Garcia v. State*, 367 S.W.3d 683, 689 (Tex. Crim. App. 2012). The Corpus Christi–Edinburg Court then used that definition when reviewing the sufficiency of the evidence to support a deadly conduct conviction in *Caballero v. State*, No. 13-20-00109-CR, 2021 WL 2231266, at *3–4 (Tex. App.—Corpus Christi–Edinburg June 3, 2021, pet. ref'd) (mem. op., not designated for publication). But as the *Cormier* Court pointed out, "[a]n appellate court's application of a definition to a statutorily undefined term in reviewing the sufficiency of the evidence does not in turn dictate that a trial court must define that term for the jury when the statute does not." *Cormier*, 540 S.W.3d at 191.

We agree with *Cormier* that "the lack of a definition for 'imminent' in the Penal Code and the Code's frequent use of 'imminent' as an undefined modifier support the conclusion that 'imminent' has a common meaning." *Id*. at 192; *see also Green v. State*, 476 S.W.3d 440, 445 (Tex. Crim. App. 2015) ("As a general matter, definitions for terms that are not statutorily defined are not considered to be the 'applicable law' under Article 36.14, and it is thus generally impermissible for the trial court to define those terms in the jury instructions."). Given the case law cautioning against providing non-statutory instructions or definitions, we cannot conclude that the trial court erred in refusing to submit the requested definition. *Beltran De La Torre*, 583 S.W.3d

at 617; *Walters*, 247 S.W.3d at 211; *Druery*, 225 S.W.3d at 509; *Green*, 476 S.W.3d at 445. We therefore overrule Johnson's jury charge complaint.

## CONCLUSION

Having overruled Johnson's appellate arguments, we affirm the judgment of the trial court.

Beth Watkins, Justice

DO NOT PUBLISH