Filed 8/6/24  P. v. Fox CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>NOAH FOX,<br><br>Defendant and Appellant. | F085594<br><br>(Super. Ct. No. VCF351754C)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Tulare County.  Nathan G. Leedy, Judge.

Marcia R. Clark, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Julie A. Hokans and Darren K. Indermill, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

Noah Fox stands convicted of special-circumstance murder and related crimes. On appeal, he alleges the trial court improperly admitted into evidence his pretrial statements, violating *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*).  He also

contends the trial court erred in denying a new trial motion based on juror misconduct. Finding no error, we affirm the judgment.

## BACKGROUND

*Charges*

The Tulare County District Attorney charged Fox with committing murder while engaged in a robbery (Count 1; Pen. Code,[1] §§ 187, subd. (a) & 190.2, subd. (a)(17)), robbery (Count 2; § 211), and conspiracy (Count 3; § 182). Counts 1 and 2 also included an allegation for personally discharging a firearm causing great bodily injury (§ 12022.53, subd. (d)).

*Evidence*

Several individuals, including Fox, planned to use a ruse to rob a marijuana dealer—the victim in this case. A meeting was set and, when Fox arrived with his cohort, he was armed with a firearm and entered the victim's vehicle. The victim's girlfriend was unexpectedly present in the vehicle.

According to the victim's girlfriend, Fox pointed the firearm at the victim and "demanded the marijuana."[2] She later denied this statement.[3] A scuffle ensued between Fox and the girlfriend, and Fox shot the victim in the back, causing his death.

Eventually, Fox and an accomplice ended up at a nearby park. A short while later, law enforcement encountered them, found the firearm, found marijuana, and interviewed them. In total, Fox provided three statements—one at the park, one at the police station, and one at trial.

---

[1] All statutory references are to the Penal Code.

[2] This statement was made to, and testified to by, a law enforcement officer investigating the incident immediately after it occurred.

[3] The victim's girlfriend did not testify at trial; she testified at the preliminary hearing, where she denied Fox demanded marijuana, and *that* testimony was read into the record at trial.

2.

In the park, Fox admitted he shot the victim. He denied intending to shoot the victim, claiming instead he "was trying to shoot out [a] window" in the vehicle. He also admitted the plan to rob the victim. He was subsequently arrested and interviewed again at the police station.

There, Fox reiterated the plan to rob the victim. He admitted he "pointed" the firearm at the victim and demanded marijuana. Ultimately, "[he] shot him …."

At trial, Fox testified he and his group "came up with the idea to rob" the victim. When he first approached the victim, he hesitated because the victim's girlfriend was present, deciding then not to commit the robbery. Nonetheless, he returned to the victim's vehicle to "tell 'em [to leave]." When he tried to sit down, however, the "gun fell out of [his] pocket" and "it just all went bad." He denied pointing the firearm and demanding marijuana and denied intentionally "shoot[ing]," explaining he earlier lied to law enforcement to maximize his culpability and to protect his "buddies[.]"

*Verdict and Sentence*

A jury found Fox guilty as charged. All allegations were found true. He was sentenced to serve life in prison without parole.

## DISCUSSION

Two challenges are raised on appeal. First, did the trial court properly admit Fox's pretrial statements into evidence? Second, did the trial court properly deny the motion for a new trial? We find no error by the trial court on both issues.

### I. No *Miranda* Violation

Fox claims he was in custody at the park, rendering his statement inadmissible because he was not administered his *Miranda* rights. Alternatively, he suggests his rights were undermined by an "unlawful two-step" interrogation. (See *Missouri v. Seibert* (2004) 542 U.S. 600.)

The People contend Fox "was not in *Miranda* custody at any point" in "the park prior to his formal arrest." We agree.

3.

**A. Additional Background**

Prior to trial, the parties litigated the admissibility of Fox's statements at the park and police station. The trial court considered the following evidence in its ruling.

The law enforcement officer that interviewed Fox knew Fox, based on a suspect description, may have been involved in a crime when the officer arrived at the park. The officer "walked up" and engaged Fox in "casual conversation …." An accomplice was near Fox, and that accomplice was quickly arrested when a second officer found a firearm in the accomplice's backpack. At that point, Fox was "ask[ed]" to move away from the accomplice "to create some separation, [and] to figure out what exactly their involvement with everything was." Fox was then "asked [to] sit down," and he complied.

After Fox sat down, the interviewing officer asked if he could see his phone. Fox again complied, and the officer found a text message stating, "I shot Terry." The officer inquired into the message, and Fox confessed he was "just involved in a shooting," and the firearm found in the accomplice's backpack was the one he just used. The officer started recording the conversation, in which Fox detailed the plan to rob the victim, but claimed the shooting was either accidental or unintentional. Fox was arrested after "an in-field show-up … identification" by a witness to the crime. The officer then told Fox, "[W]e're gonna take a ride down to the police station … and talk about this a little bit further and then we'll be done." The officer admitted he kept asking questions at the park because Fox "was so willing to give up all this information[ and] answer questions," rather than arresting him earlier or reading him his *Miranda* rights.

At the station, the officer stated, "[W]e're just gonna continue where we … left off out there." He then read Fox his *Miranda* rights, which Fox had stated had been read to him "twice at school," "[e]arlier [that] year." The officer essentially reinterviewed Fox entirely, with Fox this time admitting to intentionally robbing and shooting the victim.

4.

The trial court took the matter under submission. It later ruled Fox's statements were admissible because they "were voluntary."

**B. Analysis**

" 'Before being subjected to "custodial interrogation," a suspect "must be warned that he [or she] has a right to remain silent, that any statement he [or she] does make may be used as evidence against him, and that he [or she] has a right to the presence of an attorney, either retained or appointed." ' " (*People v. Leonard* (2007) 40 Cal.4th 1370, 1399-1400.) "Whether a defendant was in custody for *Miranda* purposes is a mixed question of law and fact. [Citation.] When reviewing a trial court's determination that a defendant did not undergo custodial interrogation, an appellate court must 'apply a deferential substantial evidence standard' [citation] to the trial court's factual findings regarding the circumstances surrounding the interrogation, and it must independently decide whether, given those circumstances, 'a reasonable person in [the] defendant's position would have felt free to end the questioning and leave ....' " (*Id.* at p. 1400.)

" '[C]ustody' is a term of art that specifies circumstances that are thought generally to present a serious danger of coercion. In determining whether a person is in custody in this sense, the initial step is to ascertain whether, in light of 'the objective circumstances of the interrogation,' [citation] a 'reasonable person [would] have felt he or she was not at liberty to terminate the interrogation and leave.' [Citation.] And in order to determine how a suspect would have 'gauge[d]' his 'freedom of movement,' courts must examine 'all of the circumstances surrounding the interrogation.' [Citation.] Relevant factors include the location of the questioning, [citation], its duration, [citation], statements made during the interview, [citations], the presence or absence of physical restraints during the questioning, [citation], and the release of the interviewee at the end of the questioning ...." (*Howes v. Fields* (2012) 565 U.S. 499, 508-509 (*Howes*).) " 'Once the scene is set and the players' lines and actions are reconstructed, the court must apply an objective test to resolve the ultimate inquiry: was there a formal arrest or

5.

restraint on freedom of movement of the degree associated with a formal arrest.' "
(*Yarborough v. Alvarado* (2004) 541 U.S. 652, 663 (*Yarborough*).)

Here, nothing in the record indicates the conversation at the park was adversarial.[4] While it is true Fox stated he shot the victim, he also claimed it was accidental or unintentional. He was asked, but not commanded, to sit down during the interview. He was not otherwise restrained. In short, there was not " 'a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest.' " (*Yarborough, supra,* 541 U.S. at p. 663.)

Illustrating our conclusion is the California Supreme Court's decision in *People v. Thomas* (2011) 51 Cal.4th 449 (*Thomas*). There, a person was slain at a high school and law enforcement questioned the person who "discovered the victim's body." (*Id.* at p. 475.) That person—the eventual defendant—was told " 'he was a witness in th[e] crime and that … detectives [were] en route and due to the severity of the crime the detectives would probably be handling the interviews of the primary witnesses and that he was going to be detained.' " (*Id.* at p. 476.)

The defendant in *Thomas* was placed in the "rear" of a "patrol vehicle" and the "rear doors of the patrol vehicle could not be opened from the inside." (*Thomas, supra,* 51 Cal.4th at p. 476.) Twenty minutes later, the defendant was "let … out" and questioned. (*Ibid.*) He "eventually" explained "he was a substitute janitor," "discovered the victim's body," and "pointed out that he had blood on himself …." (*Ibid.*)

The California Supreme Court concluded the defendant in *Thomas* was not in custody when "he was interviewed." (*Thomas, supra,* 51 Cal.4th at p. 477.) This case is no different. Both the defendant in *Thomas* and Fox made inculpatory statements

---

[4] We have listened to the recording from the park, which begins *after* Fox discloses shooting the victim. The conversation is not confrontational.

6.

involving them in an apparent crime.[5]  Indeed, unlike the defendant in *Thomas*, Fox was *not* explicitly told he was detained.

It is true, on the other hand, Fox presumably observed his accomplice quickly subjected to a formal arrest prior to questioning by law enforcement.[6]  He was also asked to move and sit prior to questioning.  These facts, however, do not in our view transform the interaction into the equivalent of a formal arrest—moving and sitting is certainly less restrictive than placement in a patrol vehicle.[7]

"*Miranda* is to be enforced 'only in those types of situations in which the concerns that powered the decision are implicated.'  [Citation.]  Thus, the relatively nonthreatening detention involved in a traffic stop or *Terry* stop … does not constitute *Miranda* custody."[8]  (*Maryland v. Shatzer* (2010) 559 U.S. 98, 113.)  The facts in this case— casual conversation, asking to sit, voluntarily relinquishing phone, discussing shooting, and observing accomplice's arrest—do not breach that concern.  Accordingly, Fox was not in custody in the park prior to his formal arrest and there is no *Miranda* error.[9]

---

[5] Importantly, at the park, Fox did not explicitly admit to a crime but rather explained the shooting was accidental and unintended.  This is a material fact in determining whether a " 'reasonable person [would] have felt he or she was not at liberty to terminate the interrogation and leave.' " (*Howes, supra,* 565 U.S. at p. 509.)

[6] Importantly, the accomplice was *quickly* arrested because he was on probation when the firearm was discovered, *not* because he committed a robbery and murder.  We separately upheld the accomplice's conviction for murder in *People v. Solis* (Feb. 17, 2023, F082693) [nonpub. opn.].

[7] In *Thomas,* the California Supreme Court distinguished the defendant's detention in the vehicle from when he was actually later interviewed outside the vehicle.  (*Thomas, supra,* 51 Cal.4th at p. 477.)  Nonetheless, the prior restriction, like asking Fox to sit in this case, is relevant to whether a reasonable person would feel free to leave or otherwise terminate an interrogation.  (*Thompson v. Keohane* (1995) 516 U.S. 99, 113 [*Miranda* custody is determined with reference to "the 'totality of the circumstances' "].)

[8] See *Terry v. Ohio* (1968) 392 U.S. 1.

[9] This conclusion renders moot any arguments relating to forfeiture and an unlawful two-step interrogation.

## II. Denying New Trial Motion Was Not an Abuse of Discretion

After the verdict, Fox filed a motion for new trial based on juror misconduct. On appeal, he argues "it was incumbent upon … the trial court to conduct a hearing to resolve" any conflict in the evidence relating to juror misconduct. We conclude the trial court did not err.

### A. Additional Background

During juror deliberations, Juror No. 5 asked to speak with the judge. Her request was granted and she informed the judge she "fe[lt] like [she was] being intimidated … to make the decision that everyone else [was] making" and "everybody's yelling." After the judge reiterated some instructions on deliberating, the juror agreed she could continue to deliberate. The court then again explained the instructions on deliberating to the entire jury.[10] The jury returned a guilty verdict later the same day, and Juror No. 5 individually acknowledged her vote to convict.

About one month later, Fox filed a motion for a new trial based on juror misconduct, claiming a declaration from Juror No. 5 disclosed "issues [rising] … to the level of … misconduct …." In the declaration, the juror asserted "other jurors," prior to deliberations commencing, discussed "the case, witnesses, witness testimony[,] and their opinions on the matter." She also claimed, during deliberations, "[o]ne juror was yelling and screaming at [her], demanding [her] to change [her] vote." When the "yelling and screaming continued," the juror requested to speak with the judge. The juror "was not convinced that a robbery had occurred." She was also experiencing "ongoing" "medical issues" before the trial and through deliberations, including an "increased" "heart rate" and "chest pains" during deliberations. "This caused [her] to … cave[]-in" and vote guilty "so [it] all could end."

---

[10] See CALCRIM No. 3550.

8.

Based on Juror No. 5's declaration, the trial court found misconduct in jurors discussing the case prior to deliberations. It did not explicitly find misconduct in "[t]he yelling and screaming" but nonetheless found a "presumption of prejudice" and ultimately "released" jurors' identities to the parties to further investigate and potentially litigate the issues.

The People subsequently obtained declarations from all other deliberating jurors.[11] None of these jurors divulged yelling or screaming, with nine explicitly denouncing any yelling. Several jurors, however, acknowledged "tense," "emotion[al]," "heated," "frustrated," or "loud" deliberations.

Several jurors also stated there were minor discussions about the case prior to deliberations, but nothing substantive, involved, or material. For example, one juror recalled "one or two instances where someone tried to bring up … details" but the juror "immediately quieted them." Another juror recalled "little comments made about the witnesses" but those comments "had no effect on … deliberations or decisions about the case." Others explained any pre-deliberation discussions were quickly cut short.

A hearing ensued, at which Fox submitted a declaration from his investigator "point[ing] out what [the investigator] perceive[d] to be some differences in what's contained in the [above] declarations and what" those same jurors told Fox's investigator "at a different time …." The trial court read and considered all the evidence, including the declaration from Fox's investigator.

Based on the evidence, the trial court found Juror No. 5's claims about "yelling" and "screaming" were "somewhat elevated" and not "borne out by the evidence." As for jurors discussing the case prior to deliberations, the court found the People rebutted any prejudice. It found the jurors were "imperfect humans" that "slipped up on occasions and

---

[11] By deliberating jurors, we mean not including alternates.

violated … orders" "but … nothing … indicate[d] anything of substance … was discussed."

Finally, the trial court concluded Juror No. 5 was "somewhat less credible" than the "other jurors." The "claim that there was screaming [was] not believable" and her complaints "in court" during the trial were "somewhat exaggerated" based on the court's personal observations as described in the court's oral ruling.[12] The motion for new trial was subsequently denied.

### B. Analysis

"When a court has become aware of potential juror misconduct, it must conduct a sufficient inquiry to determine the facts reasonably necessary to resolve the matter. [Citations.] However, the court enjoys broad discretion in determining whether and how to investigate potential misconduct, and we review the adequacy of its inquiry with deference. [Citations.] Moreover, 'failure to conduct a sufficient inquiry is ordinarily viewed as an abuse of discretion, rather than as constitutional error.' " (*People v. Nadey* (2024) 16 Cal.5th 102, 107.)

"While 'a new trial may be warranted if a jury engages in misconduct that prevents impartial consideration of the case,' the trial court is obliged only 'to " ' "make whatever inquiry is reasonably necessary" ' to resolve the matter." ' " (*People v. Wilson* (2021) 11 Cal.5th 259, 315 (*Wilson*).) " '[A] court must hold an evidentiary hearing on alleged jury misconduct only when the defendant shows "a strong possibility that prejudicial misconduct has occurred. Even upon such a showing, an evidentiary hearing will generally be unnecessary unless the parties' evidence presents a material conflict that can only be resolved at such a hearing." ' " (*Id.* at pp. 315-316.)

---

[12] In its ruling, the court stated that in this courtroom, the jury deliberation room is situated such that the court can hear loud discussions or expressions, although not the specific content. Here, the court stated that he was picking a jury in another case while this jury was deliberating, and heard no yelling or screaming from that room.

There was no abuse of discretion in this case. The trial court determined the facts were not sufficiently in dispute as to warrant further evidentiary inquiry. For example, although Juror No. 5 claimed intimidation, nearly all other jurors denied the allegation. Combined with the trial court's personal observation of Juror No. 5 during her in-court complaint, and finding her complaints "exaggerated," the court was entitled to credit the declarations submitted by all other jurors. Resolving factual disputes is ostensibly the trial court's domain, especially when based on personal observation. (Cf. *People v. Vivar* (2021) 11 Cal.5th 510, 527 ["An appellate court may not simply second-guess factual findings that are based on the trial court's own observations."].)

Ultimately, Fox did not present " ' "a strong possibility that prejudicial misconduct ha[d] occurred." ' " (*Wilson, supra,* 11 Cal.5th at p. 315.) The evidence indicated there was no intimidation, and any pre-deliberation discussions about the case were neither substantive nor material. Most importantly, there was no indication any juror was misled, swayed, or partial to the People, due to those discussions.[13] Again, the trial court was entitled to credit these facts and it did not abuse its discretion in doing so, or by declining to hold a further hearing.

---

[13] Fox had an adequate opportunity to interview jurors and investigate the matter.

## **DISPOSITION**

The judgment is affirmed.


                                                                    SNAUFFER, J.

WE CONCUR:


MEEHAN, Acting P. J.


DE SANTOS, J.